LOUISVILLE AND NASHVILLE RAILROAD COMPANY, a corporation, *Plaintiff in Error,* v. SPEED-PARKER, INC., a corporation, *Defendant in Error.*

137 So. 724.

Division A.

Opinion filed November 9, 1931.

*Carter* and *Yonge,* Attorneys for the Plaintiff in Error; *Watson* and *Pasco* and *Brown,* Attorneys for Defendant in Error.

*W. E. Kay,* as amicus curiae.

BROWN, J.—The defendant in error as plaintiff in the court below recovered judgment against the plaintiff in error in the sum of $5,291.12, with interest from date suit was begun, for alleged overcharges on numerous carload shipments of gravel and sand, all moving between points within this State. The bill of exceptions shows that this is one of a number of cases brought by different plaintiffs against the same defendant to recover alleged overcharges on carload shipments of brick, gravel and sand, which cases involve the same questions, and that while only this one case is before the appellate court, the others are by agreement to abide the result in this case. This and the other cases were tried on an agreed statement of facts, supplemented by the introduction of Florida Freight Classifications Nos. 5 and 6 and Louisville and Nashville Railroad Tariffs G. F. O. 111-A, and G. F. O. 111-B. The several cases all involve intrastate carload shipments of brick, sand or gravel, the ladings in the cars varying greatly, some running 40,000 lbs., most of them weighing upwards of 60,000 to 80,000 pounds, and some as high as 100,000 pounds or more.

In collecting the freight, the defendant Railroad Company collected for each carload at the per car rate named in the tariff or schedule of rates, and where the car contained a lading of brick or gravel exceeding 30,000 pounds, or sand exceeding 36,000 pounds, it collected for the excess in proportion to the per car rate, treating the

weights above named as carloads and collecting for the excess lading above those weights, freights in proportion to the per car rate. It is this latter charge for the excess lading, above weights named, which was made the basis of the claims for overcharge.

The rate schedules or tariffs were, as shown by the agreed statement of facts, published respectively after the Florida Classifications Nos. 5 and 6. The two Classifications, and the two tariffs do not appear to essentially differ, so far as the questions of law necessary to be considered in arriving at a correct conclusion in this case, are involved.

The stipulation as to the facts, which was signed by counsel for the respective parties and submitted to the trial court reads in part as follows:

"That the rates to be charged, the classifications and the rules governing the transportation of freight between points in Florida are prescribed by the Florida Railroad Commission, which is clothed with such authority over Florida intrastate transportation by the laws of the State of Florida."

"The rate schedules are not published together with, but instead are separate from, the schedule or book containing the Florida classifications and rules. Said rate schedules as published and in effect when shipments in question moved were numbered and styled 'L. & N. G. F. O 111-A' until March 11, 1923, and on and after that date as 'L. & N. G. F. O. 111-B'. Each of these rate schedules bears on the title page thereof the words:

'Governed by Florida Classification No. 5, supplements thereto and re-issues thereof, applying on Florida intrastate traffic.'

The classifications and rules governing Florida intrastate traffic that were in effect during the period of the movements in question are contained in Florida Classifications Nos. 5 and 6, and effective supplements thereto.

"The commodities included in the various ladings herein involved were brick, sand and/or gravel, and to each of these commodities the Florida Railroad Commission before its movement had fixed Class "P" rating in the classification, which entitled the carrier to the Class "P" rates in the rate schedule. In these instances, however, the Class "P" rate as fixed by the Railroad Commission was not employed after January 25, 1918, on which last mentioned date the Director General of Railroads during Federal control, under competent authority, instructed the carriers throughout the United States to increase all rates to the extent of 25% in general, except as to a few commodities, wherein the Director General specified the exact amount of increase, to-wit:

> Brick  2 cents per 100 pounds
> Sand  1 cent per 100 pounds
> Gravel  1 cent per 100 pounds

Thereafter, the carriers rate schedules, i. e. L. & N. G. F. O's. 111-A and 111-B, published separately the rates on brick, sand and/or gravel at so many cents per car, dependent upon the distance traversed, and said separate rates were without specific reference to any weight either minimum or maximum, as constituting a carload."

"The aforesaid rate schedules, however, each bears on the title page thereof a notation that it is governed by Florida Classifications Nos. 5 and 6, as the case may be, in which Classifications there appear (reading from No. 6, for example):

Item 80, page 20, reads as follows:

"Brick, common, carload minimum weight 30,000 pounds, class "P".

Item 55, page 43,

"Gravel, carload 36,000 pounds, class "P".

Item 118, page 60,

"Sand, carload 36,000 pounds, class "P".

"And in said Florida Classifications there appears

under the heading: "Section 3: Rules Governing the Transportation of Freight." Rule 10, which carried a head note reading as follows:

"Carload Shipments."

'10. (1) In all cases in which the classification provides a rate of 100 pounds, per ton, or per barrel, giving to carload shipments lower rates than apply to less than carload shipments, the standard minimum weight of a carload shall be 24,000 pounds, unless otherwise specified. Where the actual weight loaded in a car is in excess of the minimum weight, such excess may be charged for in proportion to carload rates; provided, that in no case shall the amount collected on less than a carload exceed the price per carload.'

"In collecting freight charges the defendant required payment of said charges upon 36,000 pounds of sand and upon 30,000 pounds of gravel or brick in each car as for a carload, and upon the excess weight of the lading in the car at a proportionate rate, e. g., if a car of sand contained 45,000 pounds the freight collected would be $1\frac{1}{4}$ times the carload rate on sand named in the rate schedule; if the lading of brick or gravel weighed 45,000 pounds the freight charges collected would be $1\frac{1}{2}$ times the carload rate on brick or gravel, as the case might be. Briefly, 36,000 pounds of lading was treated as a carload of sand, and 30,000 pounds of lading as a carload of brick or gravel."

"Before suits, the plaintiffs presented the claims here sued on to the Florida Railroad Commission with the request that in accordance with Section 4650 of the Revised General Statutes of Florida it institute proceedings to recover or require the carriers to repay the items sued for as overcharges, but the said Commission refused to enforce recovery of the claims and denied the request of plaintiffs.

"Plaintiffs contend:

(First) That the commodity rates published in L. & N. G. F. O's 111-A and 111-B are the lawful rates to be

charged per car regardless of the weight of the lading thereon.

(Second) That the publications of said commodity rates removed the application of the classification rating thereon, i. e. Class ''P''.

(Third) That even though the rules in the classification continue to govern in construing and compiling the transportation charge according to the rates in the rate schedule yet Rule 10 of the Florida Classification hereinbefore quoted has no bearing since the first sentence thereof shows that it does not apply when rates are published ''per car.''

(Fourth) That the rate schedules should be construed as worded and in the absence of any weight (either maximum or minimum) by which to measure a carload, the charges per car therein stated, apply, regardless of the weight of the contents of the cars in question.

''Defendant contends:

(First) That while the rates in the rate schedules (L & N G. F. O's 111-A and 111-B) are stated as so much per car, said rate schedules being governed by Florida classification No. 6 it is necessary to refer to the Classification and its rules to determine the measure or limit or minimum of what constitutes a carload of brick or sand or gravel.

(Second) That inasmuch as in said classification the minimum carload weight on common brick is 30,000 pounds, on sand 36,000 pounds and on gravel 30,000 pounds, and since the second sentence of Rule 10, viz:

'Where the actual weight loaded in a car is in excess of the minimum weight, such excess may be charged for in proportion to carload rates,'
provides that any excess over the minimum carload weight in said cars may be charged for proportionately, that it was within its lawful rights and, in fact was bound by law to charge proportionately for the excess

weight of the lading in the cars over and above said minimum weights.

(Third) That this has been the practice at all times, not only by this carrier but, to our information and belief, by all carriers, on intrastate traffic in Florida. And this practice is in accord with the knowledge, understanding and permission of the Florida Railroad Commission. For more particular evidence thereof, defendant says that before suit herein, plaintiffs presented these claims to the Florida Railroad Commission with the request that it institute proceedings or command the carriers to repay these items as ''overcharges'', in accordance with Section 4650 of the Revised General Statutes of Florida; but, instead, the Florida Railroad Commission refused to recognize said claims and denied their requests.

''Copies of the report of the Florida Railroad Commission, the rules adopted by it above referred to, the Florida Classifications 5 and 6, and L. & N. tariffs G. F. O's 111-A and 111-B are herewith presented to be considered by the Court in connection with this stipulation of which they are made a part.''

There was an additional stipulation filed, reading in part as follows:

''In addition to the stipulation of facts agreed to and filed herein the parties further stipulate subject to the objections hereinafter stated as follows:

''Subsequent to the times the claims involved in these suits accrued and after demand by plaintiff upon defendant for payment, the defendant filed with the Florida Railroad Commission an amendment of its rate schedules, which was approved by the Commission, stating specifically that the rates in cents per car on brick and gravel applied per car of 30,000 pounds excess in proportion and that the rates in cents per car on sand applied per car of 36,000 pounds excess in proportion.

''Defendant objects to the admission in evidence of

such stipulation numbered 1 on the grounds that the facts therein stated are, (1) immaterial, (2) irrelevant, (3) do not tend to support any issue in the cause, (4) the matters stipulated (a) arose subsequent to the controversy involved in these cases, (b) cannot be used as admissions of or estoppels against defendant, and (c) cannot be used as aids in construing the tariffs here involved.''

The defendant's objection to reading this additional stipulation in evidence was overruled, and the exception of defendant to this ruling is made the basis of one of the assignments of error.

The controlling question involved in these cases depends upon the proper construction of the applicable tariffs and the Florida Railroad Commission's Classification as they existed when the shipments in question moved. The subsequent amendment by the defendant of the rate schedule, after the controversy had arisen, even though approved by the Railroad Commission, could not change the meaning or legal effect of the applicable rate schedule and Classification in force when the cause of action, if any, arose. As was said by the Circuit Court of Appeals for the Ninth Circuit, in Spokane P. & S. Ry. Co. v. Lothrop, 15 Fed. 2nd 488: "To avoid the peril involved in the possibility that the courts would take the view here contended for by the defendant in error, they had the right to abrogate the clause without impliedly admitting the validity of such contention." See also C. A. L. Ry. Co. v. Parks, 89 Fla. 405, 104 So. 587.

Furthermore, the statutes make it the duty of the carrier to collect the lawfully published and established rate, notwithstanding its consent or agreement not to do so, or the fact that it may have, in the absence of such statutes, conducted itself in such a manner as to estop itself from the collection of the correct rate. Pittsburgh, C. C. & St. L. Ry. Co. v. Fink, 250 U. S. 577, 63 L. Ed. 1151. Therefore, the amendment by the defendant to its tariff,

with the approval of the Railroad Commission, made after this controversy had arisen, was, in our opinion, immaterial and irrelevant, and should not have been admitted in evidence.

Coming now to the main question involved, the contention of the plaintiff in the court below defendant in error here was that by the publication of L. & N. Tariffs C. F. O. 111-A and 111-B, assigning specific rates "in cents per car" to brick, sand and gravel, and the tariff sheets making these rates not containing any exception, those were the only rates that could be charged for carload shipments of those commodities, regardless of the weight of the lading contained, and thereby excluding the application of class rates and of Rule 10 of the Florida Classification, and affording no basis for assigning and charging for minimum carload weights, excess in proportion. This contention has been ably argued in behalf of the plaintiff below, defendant in error here, but, for reasons hereinafter given, we are not convinced that the contention is sound.

In support of their position, counsel for the defendant in error cite certain decisions of the Federal courts and of the Interstate Commerce Commission to the effect that where the language of a tariff is ambiguous, it should be construed most strongly against those who framed it; that where two designations of a tariff are equally appropriate, the shipper is entitled to have applied the one specifying the lower rate; that when a commodity is included in more than one tariff or designation, that which is more specific will be held applicable; and that, as a general rule, commodity rates will prevail over class rates. Counsel for defendant in error also stress the fact that each of said tariffs, on the second page, gives an "Index of Commodities," including in the list given thereunder brick, gravel and sand, each item being followed by a reference to page 6 of the tariff, on which com-

modity rates are prescribed in cents per car according to distances, and that from this list of commodities class rates are excluded by the following language immediately following the heading, "Index of Commodities," to-wit: "Following list enumerates only such articles as are given specific rates. Articles not specified will take class rates." Attention is also directed to page 3, where under the head of "Minimum Charges," it is said: "The minimum charge for carload shipments shall be 1500 cents per car." This is followed by the further statement: "Note. Will not apply on the following commodities"; giving a list of commodities including brick, sand and gravel. Also, on page 6 of each tariff, where the commodity rates are set out, applying to various commodities, including brick, sand and gravel, in cents per car, scaled according to distances, there is no reference to minimum or maximum rates, no footnotes, nor any reference to any other tables.

In this connection defendant in error further insists that the question here involved has been determined in its favor by several decisions of the Interstate Commerce Commission, to the effect that where a tariff has published charges per car, even though a minimum weight is assigned for a carload, the carrier can only collect a flat charge per car, regardless of lading weight; citing Brooks-Scanlon Corporation v. A. C. L. R. R. Co., 113 I. C. C. 237; Baehl & Co. v. Central of Ga. Ry., 115 I. C. C. 679; West Florida Lumber Co. v. G. F. & A. Ry. Co., 129 I. C. C. 62.

Turning now to the arguments advanced by counsel on behalf of plaintiff in error, some preliminary observations might pertinently be made. In Hohenburg v. L. & N. R. Co., 46 Fed. (2nd) 952, the Circuit Court of Appeals for the Fifth Circuit said:

"The matter of construing such a printed railroad tariff does not differ in character from the construc-

tion of any other document which is in dispute. It presents a question of law, and as it concerns an interstate tariff it is one of Federal law. In this respect the court is not bound by the construction placed upon the tariffs by the Commission. Great Northern R. Co. v. Merchants' Elevator Co., 259 U. S. 285, 290, 42 S. Ct. 477, 66 L. Ed. 943, 946; Texas & P. R. Co. v. Leatherwood, 250 U. S. 478, 480, 39 S. Ct. 517, 63 L. Ed. 1096, 1098.''

Where there is no ambiguity in the language used, a rate may be unjust and yet be enforced as the established one, but in doubtful cases, in the construction of a tariff, as of a law, in order to arrive at the intent of its framers, a court is warranted in considering how the rates claimed would operate as a matter of justice. Davis v. Prairie Pipe Line Co. (C. C. A. 8) 298 F. 393, 397; Pillsbury Flour Mills Co. v. Great Northern Railroad Co. (C. C. A. 8) 25 F. (2nd) 66, 68, 69.''

And in Pillsbury Flour Mills v. Great Northern Ry. Co., 25 Fed. 2nd, 66, it was held (quoting from headnotes 4, 6, and 7) that:

4. ''While there may be some rules of construction peculiarly applicable to a railroad tariff, its construction is not a matter *sui generis*, but presents ordinarily a question of law, which does not differ in character from those presented when the construction of any other document is in dispute.''

6. ''In construction of statutes and of contracts, effect is to be given, if possible, to every word, clause, and sentence.''

7. ''The rule that, in determining the meaning of a part of a document, resort may be had to other parts, in order that the whole may stand, is recognized in the construction of railroad tariffs.''

A railroad tariff should be construed as an entirety, considering both the limitations on its title page and the rules contained therein. McCaffrey Bros. v. C. B. & Q. R. Co., (Neb.) 207 N. W. 503.

Both tariffs here involved show on their title pages that they are ''Applicable on Traffic having Origin, Des-

tination and Entire Transportation within the State of Florida;" that they "Will not apply on traffic received from or delivered to connecting lines," and that they are "governed by Florida classification No. 5," as to tariff No. 111-A, and by Florida Classification No. 6, as to tariff No. 111-B. In accordance with the well settled rules for the construction of both statutes and contracts, these tariff sheets must be construed in connection with the rules and provisions of the Florida Classifications referred to on their title pages, and in such a way as to harmonize therewith unless irreconcilable conflict is made to appear.

The rules of construction applied by the Interstate Commerce Commission to interstate tariffs, as illustrated by the decisions of such Commission cited by defendant in error, lose much of their force, and are largely inapplicable, in a case of this kind, where we are dealing with tariffs applying solely to Florida intrastate traffic issued under the authority of the Florida Railroad Commission. There is a fundamental difference between the two. While the supervision of interstate rates was fully conferred upon the Interstate Commerce Commission by the Federal Act to Regulate Commerce, adopted in 1887, and as subsequently amended, yet, (contrary to the State system) *power to initiate rates was left to the carriers,* subject to the power of the Interstate Commerce Commission to suspend, or after hearing, to set them aside, when shown to be unreasonable. The Act of Congress did not originally confer upon that body the power to prescribe and establish railroad tariffs of rates which should govern in the future. The tariffs are framed by the railroads and filed with the Interstate Commerce Commission and become effective unless suspended or set aside by the Commission. See C. N. O. & T. P. R. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 S. C. R. 700, 40 Law ed., 935; Interstate Commerce Comm. v. Ala. Midland R. Co., 168 U. S. 144, 18 S. C. R. 45 Law ed.,

414; Interstate Commerce Comm. v. C. N. O. & T. P. R.
Co., 167 U. S. 479, 17 S. C. R. 896, 42 Law ed. 243. When,
therefore, a controversy arises between a shipper and a
carrier involving the construction of an interstate tariff
of railroad rates, the Interstate Commerce Commission
has very properly held that where there is any ambiguity
in the language of the tariff, it should be construed most
strongly in favor of the shipper and against the party
which drafted and framed the document, that is, the rail-
road company.

But here we are dealing with a different situation.
Under the laws of this State the Railroad Commissioners
are vested with greater powers with reference to intra-
state freight and passenger rates than is the Interstate
Commerce Commission with reference to interstate rates.
Our statute (section 6703 C. G. L.) says that: "It shall be
the duty of said Commissioners: 1. To make reasonable
and just rates of freight and passenger tariffs to be ob-
served by all railroads, railroad companies and common
carriers doing business in this State over their respective
lines. * * * 2. To make reasonable and just rules and reg-
ulations to enforce observance of their tariffs. * * * 4. To
make reasonable and just rules and regulations for the
prevention of any unjust discrimination against persons
or localities in charges or in furnishing facilities." And
our laws further provide (see Sec. 6721 C. G. L.) that
the Railroad Commissioners shall make and furnish to
each common carrier doing business in this State printed
or written schedules of rates and charges on intrastate
transportation, and shall, as often as circumstances shall
require, change or revise any schedule or schedules and
furnish the carriers with notice of such changes or re-
visions, and of the time when they shall go into effect.
Thus in this State the power of the carriers to initiate
rates on intrastate traffic is not recognized. The *lawful
rates* and the rules and regulations governing the same,

are the rates and rules of the Florida Railroad Commission, and not of the carriers. So the case we have before us does not involve the construction by the carrier of its own tariffs and regulations, but it involves the construction by the court of the tariffs, rules and regulations made and promulgated by or under the authority of the Railroad Commissioners of this State. Therefore, in considering any Florida intrastate rate, no announcement or construction by the carrier can be considered otherwise than as simply informative, and has no force or effect when departing from the rates, rules or regulations of the State regulatory body. Therefore some of the rules applied by the Interstate Commerce Commission in construing interstate railroad tariffs are neither appropriate to nor controlling in such a case as we now have before us.

Each of the local tariffs here in question expressly and plainly provided that they should be ''governed by'' the Florida Classifications then in effect. So the rules and regulations contained in such Classifications *must govern* unless the local tariff expressly provides otherwise, or makes provisions which are necessarily repugnant to or inconsistent therewith. Each being issued by or under the same authority—the State Railroad Commission—the specific provisions of the local tariffs must, where reasonably possible, be construed so as to harmonize with the general provisions of the Classifications. Just as in the construction of statutes, implied repeals of one statute by another are not favored, where there is a field for the operation of both and there is no irreconcilable conflict or inconsistency between them, so it should be held that a long standing general rule of the Railroad Commission, such as Rule 10, expressive of a general principle tending to preserve uniformity of treatment to all shippers and based upon the underlying concept of a fair relation between the weight of the freight carried and the rate

charged, should not be held to be set aside by the provisions of a tariff schedule unless the latter expressly provides an exception from the general rule or is clearly inconsistent therewith. As was said in the 5th headnote to the case of Pillsbury Flour Mills Co. v. Great Northern Railway Co., *supra*: "It is an element rule of statutory construction that general and specific provisions in apparent contradiction may subsist together, the specific qualifying and supplying exceptions to the general, and this rule applies to contracts, and has frequently been applied by the Interstate Commerce Commission in construing railroad tariffs." And in United Shoe Machinery Corp. v. Director General, 55 I. C. C. 253, it was said: "In order to determine if the export rule is applicable on the shipment in question the Commission cannot consider only the part of the rule that is favorable to the plaintiff's contention and ignore other provisions of the tariff that make clear its application. The tariff must be considered in its entirety, considering both the limitations on its title page and the rules contained therein." See also Red River Lumber Co. v. Director General, 107 I. C. C. 671, where it was held that a general rule contained in a certain Tariff Circular must be considered, although not made a part of the tariff, and held that this general rule determined the applicable rate, and its incorporation in the tariff was not necessary. But here, each of the tariff schedules expressly stated on its title page that it was governed by the Florida Classifications 5 and 6 respectively, and these classification pamphlets have on their title page the following: "This Classification applies where freight tariffs specifically state that the rates contained therein are governed by the Florida Classification." Each of these Classifications also contained the above mentioned Rule 10 of the General Rules of the Railroad Commission "governing the transportation of freight," and this rule is entitled, "Carload Shipments."

Rule 10 contains a general provision to the effect that: "Where the actual weight loaded in a car is in excess of the minimum weight, such excess may be charged for in proportion to carload rates; provided, that in no case shall the amount collected on less than a carload exceed the price per carload." We find nothing in the two tariff schedules which expressly, or by necessary implication precludes the application of this rule to carload shipments of brick, sand and gravel, especially in view of the statement on the title page of each tariff that such tariff is governed by the Florida Classification. Both the Florida Classification Books, numbered 5 and 6 respectively, assign carload shipments of brick, gravel and sand to class P, and fix the minimum carload weights at 30,000 pounds for brick and gravel and 36,000 pounds for sand. The changes made in the rate schedules after the Director General's order increasing the rate on brick two cents per 100 pounds and on sand and gravel one cent per 100 pounds did not mention minimum carload weights and hence did not change the minimum weights per carload as fixed by the classification for carload shipments of such commodities. The rate was changed, but not the minimum weight for carloads. Nor was there any note or exception precluding the application to such shipments of that provision of Rule 10 to the effect that "where the actual weight loaded in a car is in excess of the minimum weight, such excess may be charged for in proportion to carload weights." The provisions in the Railroad Commission's Classifications fixing minimum carload weights for brick, sand and gravel, and the quoted provision of Rule 10, continued to apply when these shipments were made. That this was the view of the Railroad Commission itself was plainly indicated when, as shown by the agreed statement of facts, the Commission refused to enforce recovery of these alleged overcharges, here sued for, when requested so to do by

the shipper, the plaintiff in the court below. Under section 4650 R. G. S., being 6737 C. G. L., if these claims of overcharges had been well founded, the plaintiff had the right, by written demand, to require the Commissioners to enforce recovery thereof. It is well settled that while a departmental ruling or construction is not conclusive on the courts, it will be accorded considerable weight, when not in conflict with established legal principles.

It is true that the tariff schedules introduced in this case substituted a specific rate in cents per car on brick, sand and gravel, in the place of the former Class P rate, but none of the tariff provisions quoted by defendant in error expressly took carload shipments of brick, sand and gravel out of Class P, nor did they expressly or by necessary implication abrogate or repeal the minimum carload weights fixed by the Railroad Commission's Classification, thus leaving them, together with Rule 10, in full force and effect. The change in rate seems to have been built up on or superimposed upon the Class P rate, in such a way as to conform to the increase in rate per hundred pounds ordered by the Director-General, but with the express provision that the rate schedules were governed by the Florida Classification. Rule 10, contained in the Classifications, is a general rule of the Florida Railroad Commission, having the force of a general law, and would therefore have been applicable even though not referred to in the rate schedule. It follows, therefore, that the rate schedules when construed in connection with the classifications fixing a minimum carload and containing Rule 10, to which it refers, plainly required the shipper to pay freight at so many cents per car, and for any excess in a car over and above the prescribed minimums to pay in proportion to the carload rate, as provided by the rule. It appears that Class P rates have always been carload rates. In State ex rel. v. L. O. P. & G. R. Co., 74 Fla. 361, 77 So. 223, this court, speaking

through Mr. Justice Ellis, defined Class P freight as ''carload lots of certain commodities weighing per car not more than a certain number of pounds which varies according to the commodity hauled.''

This construction is in harmony with the general principle that freight rates are applied according to weight. There are some exceptions to this rule, for the convenience of shipper and carrier; such, for instance, as carload movements of cattle, where it is to the interest of the shipper and the carrier that the animals be so placed as to hold each other up in transit. But with certain special exceptions, the practically invariable rule, in both State and intrastate traffic, is that the charge for the service shall have some just and reasonable relation to the weight of the lading.

Furthermore, any other construction would open the door to unfair and unjust discriminations, which are strictly forbidden. Section 4614 Rev. Gen. Stats., as amended in 1925, and now appearing as section 6699 C. G. L., prohibits under penalty any common carrier from making any unjust discrimination in rates or compensation for transportation of passengers or freight of any description. If the contention of defendant in error that the plaintiff in error could only charge a flat rate per car, without regard to weight, be sustained, the carrier could furnish favored shippers with cars carrying 80,000 to 100,000 pounds, which they could load to capacity and get transported at the same cost per car as less favored shippers who were furnished with cars of less carrying capacity. Any construction which permits any shipper to load into any vehcile a greater quantity of freight than his competitor in another vehicle, and pay no more for the greater quantity than his competitor does for the smaller, offends against one of the elemental principles underlying our statutory system of public regulation of common carriers, that is, uniformity of treatment to pas-

sengers and shippers, and the elimination of all unjust discriminations. It might be remarked that the bill of particulars attached to the declaration in this case shows that every carload exceeded the minimum weight and in nearly every instance the car contained in weight from one and one-half to three minimum carloads.

The first clause of paragraph 1 of Rule 10 was evidently framed to fix a definite minimum weight of 24,000 pounds as a carload in all cases where the classification failed to fix it. Brick, sand and gravel were, as to minimum weights, otherwise specified in the Classification, as above noted, and these commodities, when shipped in less than carloads, come within the first clause of the rule, for, when so shipped, the classification places them in Class 6, and the rate schedule gives the charges on this class far in excess of the rate for carload shipments of the same commodity. If therefore, the second clause of paragraph 1 of Rule 10 is tied to, or considered in connection with, the first clause, it still controls the shipments in question. But if, as its heading implies, the rule is intended to be applicable to carload shipments generally, and the first clause or sentence is intended to fix a minimum carload weight in all commodities of every class, where not otherwise specified in the Classification, and the second clause is intended to require all actual weight in a car over the fixed minimum, to be paid for in proportion to the carload rate, no matter what the commodity might be, then the words ''per car'' in the rate schedules, read in connection with the rule and classification, necessarily mean a minimum car, and the rule requires any excess over this minimum to be charged for in proportion.

In a comparatively recent case, Seaboard Air Line Ry. Co. v. Lumberman's Co., 149 S. E. 128, involving quite similar facts and fundamentally the same questions here presented, the Supreme Court of Georgia, in a strong and illuminating opinion by Chief Justice Russell, reached the

same conclusions hereinabove arrived at. As the report of this case is available to the bench and bar, we will not prolong this opinion by quoting therefrom at length. However, in view of the far-reaching effect of the question now before us, we deem it well worthwhile to reproduce the following cogent passage from the opinion in the Georgia case:

"The classifying rate on lumber reads, 'Lumber, dressed or rough, C. L. minimum weight 24,000 pounds, class P.' This is a plain statement that the minimum weight for which a carload rate can be obtained on a shipment of lumber, dressed or rough, is 24,000 pounds. This is the minimum weight of the carload specified in this rating and the minimum weight of lumber for the carriage of which the carload rate can be obtained. Upon any less quantity than 24,000 pounds the higher rate of freight prescribed for less than carload shipments would apply. However, no matter what the nature of the shipment as to quantity, there is not stated any exception to the general principle announced in Rule 6 that freight charges shall be fixed by the weight of the shipment. The amount of freight charged in this case was based upon the actual weight of the shipments by taking the proper rate for a carload of 24,000 pounds, reducing the same by the method pointed out in rule 8 to the appropriate amount per hundred pounds, and using this latter figure in arriving at the amount of the freight payable. As said by the Interstate Commerce in Leonard v. Railroad, 3 I. C. C. 241: 'Prima facie the system of charging by weight is more just than any other. It is the only system whereby the charge is made proportionate to the service rendered. It is the only system whereby inequalities as between shippers, resulting from differences in the size of cars, can be obviated. As long as those differences exist, there is always room for favoritism, unless the carload charge is *accurately apportioned to the size of car;* and this we think has never been attempted, for the reason, doubtless, that because of the great diversities it was seen to be impracticable. The reasons ought to be very imperative which would

require the abolishment of a rule which excludes favoritism to make way for another which not only admits of but invites it.' "

For the reasons above pointed out, the judgment of the court below must be reversed with directions to enter judgment in favor of the defendant in the court below, plaintiff in error here.

Reversed and remanded, with directions.

BUFORD, C.J., AND ELLIS, J., concur.

WHITFIELD, P.J., AND TERRELL AND DAVIS, J.J., concur in the opinion and judgment.