**STATE OF FLORIDA et al. v. UNITED STATES.**

**BROOKS–SCANLON CORPORATION et al. v. SAME.**

**WILSON LUMBER CO. OF FLORIDA v. SAME.**

Nos. 511, 512, 514.

District Court, N. D. Georgia.
Jan. 26, 1934.

Opinion on Exceptions to Second Report of Master Jan. 30, 1933.

Norman, Quirk & Graham, of Louisville, Ky., for Wilson Lumber Co.

Fred H. Davis, Atty. Gen., state of Florida, and T. T. Turnbull, of Tallahassee, Fla., for state of Florida.

Alston, Alston, Foster & Moise, of Atlanta, Ga., F. B. Grier and Carl H. Davis, both of Wilmington, N. C., and W. E. Kay, of Jacksonville, Fla., for intervener Atlantic Coast Line R. Co.

Before SIBLEY, Circuit Judge, and UNDERWOOD and BARRETT, District Judges.

## SIBLEY, Circuit Judge.

The present controversy arises on three separate but similar motions for restitution made one by the Railroad Commission of Florida and one by Wilson Lumber Company, and the third by Brooks-Scanlon Corporation, Wilson Cypress Company, and Cummer Cypress Company in three several bills filed by them in this court to enjoin, set aside, and annul so much of a certain order of the Interstate Commerce Commission as established a scale of intrastate rates on logs over lines of the Atlantic Coast Line Railroad Company in Florida. This court upheld the order and refused an injunction. The Supreme Court held the order invalid, and reversed the judgment. State of Florida v. United States, 282 U. S. 194, 51 S. Ct. 119, 75 L. Ed. 291. On making the mandates the judgment of this court, decree was entered on March 7, 1931, setting aside the assailed order. Jurisdiction was reserved over these motions for restitution, which prayed that the Atlantic Coast Line Railroad be required to repay what it had collected by virtue of the erroneous decree of this court pending the appeal, to be measured by the difference between the rate prescribed by the Interstate Commerce Commission and the lower rates previously in force established by the Florida Railroad Commission and known as the Cummer scale. The restitution sought by the Florida Railroad Commission was in behalf of shippers in Florida which it claimed to have been representing in the litigation by virtue of a statute of Florida. Restitution was ordered and a master appointed to ascertain it "as measured by the difference between the amount collected and the established lawful rate at the time each shipment was made as the master may

See, also, 4 F. Supp. 477; 291 U. S. 1, 54 S. Ct. 603, 78 L. Ed. 1097.

Knight, Adair, Cooper & Osborne, of Jacksonville, Fla., for Brooks-Scanlon Corporation.

Elmer B. Collins, Sp. Asst. to Atty. Gen., for the United States.

J. Stanley Payne, of Washington, D. C., Solicitor for Interstate Commerce Commission.

find it to have been." As foreshadowed in the answers to the motions for restitution, dispute arose as to whether the Cummer scale was the established lawful rate, the Railroad Company contending that it had been superseded by the Florida Commission by its Orders Nos. 979 and 990, and if not that it was unreasonable and confiscatory, and under Florida law was subject to attack in private litigation between shipper and carrier. On the master's application for further instructions we directed him to consider and report on these contentions, as the court was not then sufficiently advised touching the law of Florida to decide them. The master reported sums aggregating $293,946.-38 collected from the several claimants in excess of what would have been collected on the Cummer scale, but that while the Cummer scale had not been superseded by any valid order of the Florida Railroad Commission nor by certain injunctions issued from other courts, it was not an established lawful rate for any shipment involved because under the law of Florida it was only prima facie correct, and was in fact unjust and unreasonable, and unenforceable under the Florida statutes, and was unremunerative and confiscatory and invalid under the Constitutions of Florida and of the United States. He found that "Class P Rates" which prevailed for logs on other railroads in Florida and also on the Atlantic Coast Line for distances above 170 miles, which distances were not included in the Cummer scale, were not established on the Atlantic Coast Line for distances under 170 miles, and that there was no established lawful rate, but that the common-law obligation to carry at a reasonable rate was the only applicable limit of lawful charges. Not having been commissioned to inquire into what would have been reasonable charges, he went no further, and reported no restitution because there was no available measure of it. The matter comes before us on exceptions to this report. The claimants contend that they are severally entitled to have restitution measured by the Cummer scale, it being a rate voluntarily established and approved by the Florida Commission, the court having no power to go behind it; but if not, that the master should be directed to measure it by the common-law standard. The railroad company contends that the Cummer scale was superseded by the order of the Flor-

ida Commission and by the injunction in another court against its enforcement, but, if not, that it is noncompensatory and confiscatory and became a nullity when the railroad company elected to disregard it, and that class P rates should thereupon be applied. It also denies generally liability to make any restitution. What we now say applies equally to all the motions.

## Conclusions of Fact.

The attacked order of the Interstate Commerce Commission was made on August 2, 1928. The first judgment of this court refusing to interfere as to Northern Florida was January 17, 1929. The order went into effect February 8, 1929, in the northern portion of Florida. Thereafter, on amendment by Interstate Commerce Commission, it was made clearly applicable to the whole of Florida. This court on supplemental bill again refused to interfere by opinion dated March 22, 1929, and decree dated April 17, 1929. The railroad company intervened and became a party on March 7, 1929. The decree setting aside the order under mandate of the Supreme Court was entered March 7, 1931. The shipments in controversy were made between February 8, 1929, and March 7, 1931. Meanwhile, the Interstate Commerce Commission rates as applying to all Florida had been filed by the railroad company with the Florida Commission. The Commission on January 13, 1929, by its Order No. 979 undertook, following the first judgment of this court, to restrict their application to North Florida, and to order enforcement of their own rates elsewhere. On February 1, 1929, the Florida Railroad Commission filed a bill in the state court to require by injunction enforcement of Order No. 979. The Coast Line resisted the enforcement, and on February 5, 1929, sought to remove the case to the federal courts. On February 7, 1929, it began litigation against the Commission in another federal court, and on February 14, 1929, obtained a restraining order from the Circuit Court of Appeals to quiet the cross-fire of penalties threatening under the opposing rates. It did not, however, make any request to the Florida Railroad Commission itself to revoke or modify the Cummer scale, relying upon the annulment of it attempted by the Interstate Commerce Commission, and charging the higher rates fixed by it.

40

The Cummer scale, however, ceased to be a voluntary rate when the Railroad Company began to oppose the Florida Commission's enforcement of it, and ceased to use it on February 7, 1929.

The Florida Railroad Commission's Order No. 979 of January 30, 1929, undertaking to define the situation that would exist on February 8 when the Interstate Commerce Commission order as then limited by this court would go into effect, in its first paragraph states: "The purpose of this order is to amend the Florida intrastate rates to conform to the orders of the Interstate Commerce Commission in its docket 18364 as construed and defined by the District Court of the United States for the Northern District of Georgia in its opinion of Jan. 17th, 1929." 30 F.(2d) 116. After recognizing the effect of the order so far as supported by the court's decision to supersede the state rates in the defined territory, Order 979 does not purport directly to revoke or alter the Florida rates, but declares that they shall continue in effect "except that so long as the said decision of the said Federal court shall or may remain in force and reversed the said tariffs will under authority of the Interstate Commerce Commission have the effect of changing and increasing only and solely the intrastate rates" as defined in the Interstate Commerce Commission's order as interpreted by this court. No notice to the public or carriers and interested parties provided for by sections 6722 and 6723 of the Compiled General Laws of Florida of 1927 is recited or was formally given.

On April 20, 1929, after the second decision of this court, the Florida Railroad Commission passed its Order No. 990. It recited the intervening occurrences before the Interstate Commerce Commission and in this court, and announced a purpose to appeal, but recognized the binding force of this court's decision until reversed and then ordered to be "suspended so much of Order 979 as related to intrastate rates on logs of the sort here involved so long as the decree of said court should remain in force and effect unmodified and unreversed," and that for the same period "the distance scale of commodity rates in force and effect under the authority of the Railroad Commissioners of the State of Florida on and prior to Feb. 7, 1929, for the transportation of logs * * * be and they are hereby suspended." As to Order 990, the statutory notices were not given, but the claimants through the Commission which represented them and the complainants, except Wilson Lumber Company, by the participation of their counsel in the preparation of the order knew of it before and at the time of its making.

The Cummer scale in substance was voluntarily established in 1903 and 1904 by Jacksonville & Southwestern Railroad Company when that railroad and the timber to be transported were owned by the same interests; and when the Atlantic Coast Line Railroad Company bought the railroad were by it contracted to be maintained until all the timber was transported. In 1914, to avoid complaint of discrimination, the Atlantic Coast Line Company proposed to extend the rates to its other lines in Florida. The Florida Railroad Commission took the position that the scale was too low to be compensatory and could not be involuntarily enforced, but permitted its establishment to avoid discrimination. The railroad company was neutral in the contest before the Interstate Commerce Commission, but its contract obligations having ceased early in 1929 it began on February 5th to oppose the Florida Commission's efforts to enforce the Cummer scale in the Florida courts as above stated, and on March 7, 1929, intervened in this court as an active litigant. The scale has not been voluntarily maintained since February 7, 1929.

 The Cummer scale has never applied to any other railroad in Florida, is only about one-half of the corresponding rates under Florida class P, and about one-half of the rates on logs and comparable commodities in the same and similar territories. It is under the evidence shown to be so low as to be unremunerative to the carrier and to amount when enforced against the carrier's consent to a taking of property without due process of law. By consequence it is also unreasonable and unjust. (See Georgia Public Service Comm. v. Atlantic Coast Line R. Co., 186 I. C. C. 157, report on similar evidence No. 18364, July 5, 1932.)

All the money collected by Atlantic Coast Line Railroad Company from the several claimants on their logs between February 28, 1929, and March 7, 1931,

was collected by virtue of the intrastate rates made by the Interstate Commerce Commission and upheld by this court. Shippers and carriers were not agreeing on any rate, and no contract rate was involved.

### Conclusions of Law.

Under the special circumstances of this case we have concluded that the restitution justly demandable may be reached without jurisdictional difficulty by putting an equitable condition upon the restitution granted. The claimants all admit that they are not entitled to be repaid the full sums paid to the railroad company, but only to so much as should not have been exacted. The payments were not made under process of this court nor directly by virtue of its judgment. This court erroneously refused to interfere while the misdirected power of the United States acting through the Interstate Commerce Commission exacted the payments. The court is thus not so much bound in honor and justice to restore what was taken without inquiry into the actual rights of the parties as it would be if its own officers had taken it. If a court of equity should erroneously refuse to enjoin a trespass and the trespass should be committed pending appeal, we greatly doubt the duty or power of the court afterwards to try the amount of damages done. Moreover, strict restitution is confined to the parties to the record, as is plainly stated in Bank of United States v. Bank of Washington, 6 Pet. 8, 17, 8 L. Ed. 299, and is to be made though the court be held to be without jurisdiction over the merits; the restitution then being a mere change of possession with no adjudication upon the rights of the parties. Northwestern Fuel Co. v. Brock, 139 U. S. 216, 11 S. Ct. 523, 525, 35 L. Ed. 151. It is probably true that where the thing taken was taken directly under the court's judgment, and can be summarily and conveniently ascertained, it ought to be restored without stopping to inquire into ultimate rights. But in Northwestern Fuel Co. v. Brock, where this was in fact done, cautious language was used, thus: "We are of opinion that the proceeding to enforce the restitution * * * is under the control of the court, and that all needed inquiry can be had to guide its judgment in a summary proceeding, upon motion of the parties; the only requisite being that the opposite party shall be heard, so that in directing restitution no further wrong be committed." In Baltimore & Ohio R. Co. v. United States, 279 U. S. 781, 49 S. Ct. 492, 73 L. Ed. 954, where, as in this case, the three-judge court had acted negatively, refusing to interfere with an order of the Interstate Commerce Commission, on reversal jurisdiction to award restitution was affirmed and the amount ascertained by a master. Only the parties to the record were involved, and there was no difficulty in measuring the amount to be returned, for it was the entire amount collected. There was no danger of doing further wrong. In Arkadelphia Co. v. St. Louis & Southwestern R. Co., 249 U. S. 134, 39 S. Ct. 237, 63 L. Ed. 517, a three-judge court at the instance of the railroad company enjoined a state rate as confiscatory, requiring the statutory bond to repay the amount paid in excess of the enjoined rate. The reversal on appeal was held to entitle the shippers not alone to enforce the bond, but also to recover by way of restitution on transactions not covered by the bond. There was no uncertainty about the measure of the restitution because the amount collected established the one necessary figure in the calculation and the state rate which was upheld by the appellate court established the other. Shippers who were not parties to the record were allowed recovery by intervening before the master, the court saying, 249 U. S. 134, page 146, 39 S. Ct. 237, 242, 63 L. Ed. 517: "The Railroad Commission, in defending the rate schedules against the attack of the railway companies represented all shippers; * * * the District Court properly held the commission to be the representative of the shippers for this purpose." In Ex parte Lincoln Gas, etc., Co., 256 U. S. 512, 41 S. Ct. 558, 65 L. Ed. 1066, a gas company attacked a city gas rate as confiscatory. The three-judge court first granted an interlocutory injunction, with bond to repay overcharges, but on final hearing upheld the rate, taking a supersedeas bond on appeal. There was no reversal, but a modification by making the decree one without prejudice. So restitution on reversal was not involved. But again it was held that consumers though not formal parties were represented by the municipality and its officers, and could intervene to collect overcharges

42

under the bonds. By these authoritative precedents we are assured that we may on the reversal of a mere negative judgment award restitution and admit to its benefits the twenty-seven claimants who were not parties to the record except by representation through the Florida Railroad Commission. But we do not hold that in every case where injunction against a state or federal rate is erroneously refused the court so far warrants the rate to the world that all shippers and carriers who do business under it pending the appeal are entitled to settle their accounts in the court. The number of shippers and carriers and the complexity of the situation may be such as to justify leaving them to their usual remedies to collect reparations, overcharges, or undercharges. Even the special jurisdiction to set aside in whole or in part a rate of the Interstate Commerce Commission with the broad right of intervention allowed by 28 USCA § 45a does not make the case so distinctly one in rem with all the world a party thereto that several such suits about the same rate may not exist concurrently. Kansas City Southern Ry. Co. v. United States, 282 U. S. 760, 51 S. Ct. 304, 75 L. Ed. 684. Restitution in cases like the present is rather a judicial duty to be performed according to the judgment and conscience of the court than a perfect right to be unconditionally demanded by the party. Indeed, in Harger v. Commissioners, 12 Pa. 251, a law case, it was said, "Restitution is not of mere right. It is ex gratia, resting in the exercise of a sound discretion, and the Court will not order it where the justice of the case does not call for it," and immediate restitution was refused. In Gould v. McFall, 118 Pa. 455, 12 A. 336, 4 Am. St. Rep. 606, the words were repeated and restitution was refused because the court thought that the payments made on the reversed judgment were really made for reasons collateral to it. In Northwestern Fuel Co. v. Brock, supra, the caution is that the court do no further wrong thereby. In Arkadelphia Co. v. St. L. & S. W. R. Co., 249 U. S. 134, page 145, 39 S. Ct. 237, 63 L. Ed. 517, the ground put forward for restitution in equity is that it is a course of action thoroughly consistent with the principles of equity, and in Baltimore & Ohio R. Co. v. United States, 279 U. S. 781, page 785, 49 S. Ct. 492, 73 L. Ed. 954, the application for restitution is called in effect an equity proceeding resulting in a final decree. Assuredly in a court of equity those who seek relief must do equity and accord to others their just rights. We therefore grant restitution, but not of the blind and instantaneous sort which settles nothing, but we condition it on a full inquiry which will do justice and give full and final relief to the parties.

The shippers here admit that their right is to have, not what they have paid, but what they have lost by the court's failure originally to enjoin the federal rate; the loss being the payment less what the carrier otherwise might at the time have collected. The Cummer scale is prima facie what the carrier could have charged, but not conclusively so for several reasons. In the first place, being a Florida state rate, it must be tested by Florida law. According to the common law which is of force in Florida, except as changed by statute, a carrier's charges when not fixed by law or a contract are to be reasonable charges to be judged by any court before which a controversy arises over them. 10 C. J., Carriers, § 694; Chicago, etc., R. R. v. Iowa, 94 U. S. 155, 161, 24 L. Ed. 94. By Comp. Gen. Laws Fla. 1927, § 6698, common carriers are prohibited to charge more than a fair reasonable rate of toll or compensation. By section 6703 (1), (2), the Railroad Commission is directed to make reasonable and just rates of freight and passenger tariffs to be observed by all common carriers, and reasonable and just rules to enforce their observance. By section 6721, the commissioners are required to make for each common carrier a schedule of just and reasonable rates on its lines, revising it as necessary from time to time, and it is enacted that the schedule "shall in all suits brought against any common carrier wherein is involved the rates of any common carrier for the transportation of freight * * * be deemed and taken in all the courts of this State as prima facie evidence that the rates fixed in such schedule or schedules are just and reasonable rates." There is no special provision for testing or attacking the rates, but the general powers of the courts alone are available. A case arising under a former statute, which was passed in 1887, was Pensacola & Atlantic R. Co. v. State of Florida, 25 Fla. 310, 5 So. 833, 3 L. R. A. 661. In that case the railroad com-

pany, for which a passenger rate of 3 cents per mile had been prescribed, ignored it and charged a passenger about 4½ cents. It was penalized by the Commission and suit brought in court to collect the penalty. The defense was that the rate was unjust and unreasonable because confiscatory. .The Supreme Court held that the defense was good and that the effect of the statute was that in an action in court the rate schedule was to be taken as sufficient evidence of justness and reasonableness but not to make it conclusive against judicial inquiry, and that there was thus provided merely a new method of proving reasonableness. In numerous cases since, touching penalties, mandamus to enforce rates, and injunctions against their enforcement to which the Commission was a party, it has been ruled that the Commission exceeds its powers in making an unreasonable or confiscatory rate, and that the rate fixed is only prima facie evidence of its reasonableness. Notwithstanding the comprehensive language of the statute above quoted, a plausible argument can be made that the rates were intended to be inconclusive only in litigation between the Commission and the carrier, and not in litigation between the carrier and a shipper. Yet in Cullen v. S. A. L. R. Co., 63 Fla. 122, 58 So. 182, where the shipper sued the carrier as at common law for an overcharge, it was held that the action would lie and that the rates of the Commission were by the statute prima facie evidence of reasonableness in the case, thus applying the statute to cases in which the Commission was not a party. To the same effect is La Floridienne, etc., Co. v. A. C. L. R. Co., 63 Fla. 208, 58 So. 185. Louisville & Nashville R. Co. v. Speed-Parker, Inc., 103 Fla. 439, 137 So. 724, is cited as containing language comparing the Florida rates with those of the Interstate Commerce Commission in point of finality, but in that case the Commission rates were. stipulated by the parties as applying, and there was no contest over their reasonableness, but only over their construction. Moreover, the Florida statute differs materially from the Interstate Commerce Act (49 USCA § 1 et seq.). The latter as it stood in 1887 (24 Stat. 379), when the Florida statute was passed, contained a provision in section 14 (24 Stat. 384) that the findings of the Interstate Commerce Commission "shall thereafter, in all judicial proceedings, be deemed prima facie evidence as to each and every fact found," and in section 16 (24 Stat. 384) a like provision was repeated. While these provisions were of force, the findings were given only prima facie force. Texas & Pacific R. v. I. C. C., 162 U. S. 197, at page 239, 16 S. Ct. 666, 40 L. Ed. 940; Interstate Commerce Commission v. Alabama Midland Ry., 168 U. S. 144, at page 175, 18 S. Ct. 45, 42 L. Ed. 414. In subsequent revisions of the act, these provisions have been left out, and now appear only in section 16 (2) of the act, 49 USCA § 16 (2), as to money awards, and in section 19a (i) of the act, 49 USCA § 19a (i), as to property valuations. We think the Florida rate schedule should have no more conclusive an effect in this court than in the courts of Florida, the more especially since the Florida Railroad Commission is a party here and can give the court the full benefit of its views and information. The Cummer scale should have prima facie effect only.

Reference has been made to rule 16 of the Commission, which adopts existing carrier rates and practices if not in conflict with the orders of the Commission and prohibits a change without application to the Commission. In its first aspect this rule would only effect an adoption of the Cummer scale as a Commission rate if it were not already such. In its second aspect while providing an orderly procedure that ought ordinarily to be pursued, we think that inasmuch as the Cummer scale had been in contention for years prior to February 8, 1929, and on that date was the issue in the case brought by the Florida Commission against the Atlantic Coast Line Railroad then pending in the state court, the absence of the formality of asking permission to revoke the Cummer scale may be considered immaterial. Particularly is this true since the issue is that the scale is confiscatory and in violation of the Constitutions of Florida and of the United States. If it is, it ought not to be enforced for a single day over the carrier's protest.

■ And this brings us to a reason independent of the statutes of Florida for considering the Cummer scale an improper measure of restitution in that it is confiscatory and void. The Florida Commission in 1914 thought it too low to

be compensatory. The Interstate Commerce Commission has twice so held it to be. This court in this litigation has thus expressed itself. Our master in considering the evidence produced on this exact issue has so concluded. We agree with him. The rate has never been enforceable since the Atlantic Coast Line Company repudiated it. But for the erroneous action of this court, the railroad company might have attacked it for this cause in February, 1929, by the usual proceedings in the case then pending in the state court, or in that also pending in the federal court in Florida. The erroneous judgment of this court was no doubt the reason why it was not done. The point is that there can be no certainty that the shippers really lost everything paid above the Cummer scale by the judgments of this court because the Cummer scale was invalid and the carrier had the right to refuse, and in all likelihood would have refused, to do business under it if this court had set aside the Interstate Commerce Commission rate which superseded it. The situation is quite different from that in Arkadelphia Co. v. St. Louis & Southwestern R. Co., and Ex parte Lincoln Gas, etc., Co., where the former state rate was applied because in each case it was that rate which had been in contest and had been upheld as the final result of the litigation. While the decrees left the question of validity open to attack by a future suit so far as the future operation of the rate was concerned if confiscation could then be shown, the rate was held valid for the past and controlled the restitution. In the Arkadelphia Case, 249 U. S. 134, at page 148, 39 S. Ct. 237, 63 L. Ed. 517, we find it assumed on authorities cited, though not decided, that in spite of the adverse result in the main suit the railroad companies could in the restitution proceedings assert as to particular shippers that the rate was discriminatory and void. Only because it was not proven that the discrimination in fact amounted to unconstitutional deprivation of equal protection of the laws the contention was set aside. In the case of Baltimore & Ohio R. Co. v. United States, no question of the measure of restitution arose. In the present case, the Cummer scale was only indirectly in issue, and the Supreme Court in reversing did not uphold its validity but refused to look into the evidence of its sufficiency at all. It merely held that the Interstate Commerce Commission had not found distinctly enough the facts which would permit it to meddle with the state rate. No tribunal which has ever considered the Cummer scale has upheld it. We hold the constitutional invalidity of the Cummer scale is fatal to its use in measuring an equitable restitution.

Another contention is that the Cummer scale was in fact suspended by the Florida Commission itself during the period in controversy by its Orders Nos. 979 and 990, and particularly the latter. Probably these orders, like an act of the Legislature or the judgment of a court, should be interpreted rather by the effective words than by the preamble or the reasons given. The effective words of Order No. 990 are strong for an actual suspension of the state rates rather than a mere suspension of punitive hostilities to enforce them. But it is said that as suspensive orders, which are not directly provided for by statute, amount to a temporary change of the rates and should be preceded by notice to the interested parties under sections 6722 and 6723 of the statutes, these are void. To this the railroad company replies that it is making no point of want of notice to itself, and that the claimants of restitution are the only other interested parties, and they were at the time represented by the Commission itself which had already by its pleadings declared an ultimate purpose to collect for them this restitution, and that the complainants were further notified in that one of their counsel helped to draw Order No. 990. We content ourselves with stating these issues, and do not definitely decide them, since we think that what has preceded sufficiently disposes of the Cummer scale.

Like the master, we think the class P rates cannot be applied unless as evidence by comparison of what is reasonable. In establishing them the Commission excepted the Atlantic Coast Line Railroad; it already having the Cummer scale. Class P rates have not the prima facie force of Commission rates for that railroad.

There remains only the common-law standard of reasonableness as fixed by the court to be applied. Its application is not rate making. We have held that we have no jurisdiction in this case to enjoin or set aside a state rate. A

Commission rate is a legislative act made through a deputy; a law of commerce having only a prospective operation. The ascertainment of a past overcharge is a judicial act in which law is applied, not made. Louisville & Nashville R. Co. v. Garrett, 231 U. S. 298, 299, 34 S. Ct. 48, 58 L. Ed. 229; Prentis v. A. C. L. Co., 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 397, 14 S. Ct. 1047, 38 L. Ed. 1014. This latter is the thing we will require the master to do on a re-reference, wherein he may consider as evidence for comparison other rates established by due authority as well as other evidence hitherto taken by him and such as may hereafter be offered on this point by either party. It is the ancient issue of quantum meruit. Other issues already decided by him stand closed. An order of re-reference will be taken accordingly.

### UNDERWOOD, District Judge.

I respectfully dissent, except that I concur in the finding of fact that the rates of the Cummer scale, if not consented to or acquiesced in by the Atlantic Coast Line Railroad but enforced over its opposition, would be confiscatory.

Opinion on exceptions to second report of master.

### SIBLEY, Circuit Judge.

 The above-stated consolidated case came on for hearing upon exceptions by all parties to the second report of the master. The exceptions which relate to the admission of evidence do not set forth the evidence referred to, but require the court to search the very voluminous record to find it. We overrule these exceptions because of this failure, and because so far as we can identify the evidence referred to it appears while of great bulk to be of little if any weight and importance. Many exceptions relate to matters of mere recital or argument in the report rather than to findings of ultimate fact or conclusions of law, and we overrule such for immateriality. The exceptions which have real substance are dealt with adversely in what we now express as our conclusions and findings. We do not agree with all that is said in the report, but we do affirm its important positions and the result reached.

### Conclusions of Law.

When simple restitution was blocked by the finding under the first reference to the master that the Cummer scale was after its withdrawal as a voluntary rate not a lawful established rate because unremunerative and confiscatory, one member of this court was of opinion that restitution could not be accomplished and that the court should deny it. The majority held that inasmuch as all parties were before the court and much time had already been taken and much expense incurred in investigating the matter, that it ought under the circumstances to be brought to a conclusion, and they ordered a further prosecution of it, not as a simple restitution of a status with no adjudication of rights, but as a final ascertainment of the true account between the railroad company and each shipper before the court. The question is now raised whether the claimants of restitution by going forward under the conditions then imposed on the re-reference did or did not waive all contention as to the applicability of the Cummer scale, or, to put it otherwise, whether the re-reference could proceed without a formal renunciation of that contention. One of the two judges who concurred in the re-reference is of opinion that the condition meant only that a result should be reached on full hearing of the merits of the claim, and should so adjudicate them that there should be no suits on them before other tribunals, but that there might be a full review of all rulings made in regard to the Cummer scale or otherwise. The other concurring judge is of opinion that an abandonment of the Cummer scale as a measure of restitution was also required. His thought is not that the right of appeal from the decision of this court that the Cummer scale is void should be denied claimants, but that restitution being not an absolute right, but granted ex gratia, the affixing of a precedent condition to the grant of the right of ascertaining what, if any, restitution is recoverable based upon compensation for service on the basis of quantum meruit, that there should be an abandonment of the right claimed of recovery on the Cummer scale, as such, as fair and equitable. In view of this disagreement we cannot decide the point. But it is immaterial in this court, since all three judges concur in the opinion

that the Cummer scale is not available to measure restitution because it is confiscatory and void as an enforced rate.

■ The original burden of proof was upon the claimants of restitution. When they showed what they had paid, and that it was in excess of the Cummer scale, the apparent state rate, the burden shifted to the railroad company, which assailed the Cummer scale and overturned it as an obligatory rate. Under the conditions of the re-reference, the burden then returned to the claimants to show what should in right and justice be restored to them; the case standing much as though they were suing in a court of law for overcharges. But the placing of the burden of proof is of no great practical importance because an abundance of evidence was offered by both sides, and the master's decision and our own goes on the evidence produced and not on the failure of either 'party to produce proof.

■ In establishing the fair and reasonable charge to be made for these past shipments, the master rightly held that statutes, both state and federal, which control the making of future intrastate rates should be regarded. The common-law standards of charges by common carriers when legislative rates have not been prescribed are modified by such statutes. Since, for instance, the Florida law prohibits discrimination by common carriers, discrimination ought to be avoided not only in fixing future rates, but as far as practicable in measuring compensation for past services. The prohibition of federal law aimed at discrimination by state rates against interstate commerce is not easily applicable to such a case as this, because the existence thereof involves questions so technical and complex as not to be well examinable in a court trial and is referred by the statutes specially to the Interstate Commerce Commission; but the fact that such discrimination is prohibited is a matter that should have some bearing on the present problem. Nevertheless, we agree with the master that the decision of the Interstate Commerce Commission on July 5, 1932, that the Cummer scale resulted in discrimination against interstate commerce as respects the carrier's revenues, and that for the future a state rate conforming to the interstate rates on logs ·be applied, has no retroactive effect and does not constrain

a finding that in 1929 and 1930 the interstate rates were the only just and reasonable charge in this intrastate traffic. The prior findings of the Interstate Commerce Commission in 1928 which resulted in no valid order had no legal effect and can be given only such weight and persuasiveness as their reasoning carries with it. There is, of course, no rigid necessity for intrastate rates to conform with interstate rates. They frequently do not conform, and where there is divergence it becomes a question which are the more just and reasonable.

The cost of the service is important, but not conclusive, in fixing a future rate or a past just charge. A common carrier cannot be required to serve at a loss, but when the point of remunerativeness is reached there follows a zone of reasonableness in which the value of the service to the patron, the volume and regularity of the traffic, the history of the charge and the extent to which it has been relied on by the public in making investments and establishing businesses, and other elements, may all have an important bearing.

■ Common carriage both at common law and under legislative rates is a business rather than a succession of individual contracts. There ought to be customary and established charges for similar transportation looking to average costs and profits in the differentiated classes of traffic rather than in particular' transactions. · For instance, the fact that the carrier had misfortunes or the reverse on some particular trip ought not to affect the charges for that trip. The chances of such accidents are to be absorbed in the customary or the prescribed charges. Even as between classes of service that might logically be differentiated, sometimes considerations of policy prevent it. In the present case it appears that trainload shipments of logs can be handled more cheaply than single carloads. But the Florida Commission refused ·to permit the Cummer scale to be filed as a train load rate. The Interstate Commerce Commission did not establish any trainload rates on logs either in interstate commerce or in prescribing an intrastate rate in 1932, although it was well .aware of the difference in the cost of handling, but it fixed rates only for carloads. It is uniformly considered to be impolitic to afford a special rate to patrons of

railroads who can ship in trainloads to the disadvantage of those who can ship only in carloads. During the restitution period here involved, neither shippers nor carriers had any reason to suppose that trainload shippers would be given a rate different from proper carload rates. The master rightly concluded that a reasonable charge for carload shipments ought to be applied to all, but to be fixed in view of the fact that much of the traffic did move in trainloads at a reduced cost and was great in volume and regular in recurrence.

While in fixing a reasonable charge for past transactions the same considerations are in general present, as when a future rate is to be prescribed, there is a difference. In fixing a future rate, the effect of the rate on future traffic may be looked to, shippers and carriers being in a measure able to adjust their operations to the rate and the shippers may govern their prices and the extent of their shipments accordingly. When, as in this case, there has been a conflict between a state prescribed and a federal prescribed rate, the shippers relying on the former and the carrier on the latter, and both rates have turned out to be invalid, it is too late for either to do the things that might otherwise have been done. The court in fixing a fair charge has no occasion to consider the future, but taking all the past circumstances into consideration is to determine what is just and reasonable. There was in fact no interstate commerce in logs, so that discrimination against interstate commerce as to persons and places need not be regarded. Discrimination as respects the revenues of the carrier, while a most important question in fixing permanent future rates, can hardly be investigated or considered in a private litigation between carrier and shipper regarding a past shipment. On the other hand, the fact that the state rate relied on by the shippers during all this period was one originally named by the carrier and voluntarily maintained by it for many years while the shippers were making their investments and establishing their businesses upon the faith of it is deserving of great weight in considering the fairness as between carrier and shipper of suddenly demanding more than double that rate.

It will be remembered that the order of the Interstate Commerce Commission which authorized the increase was resisted successfully and was annulled. The master's report shows that he gave attention to all the important elements proper to be considered, and while it is not so specific as it might be in its subordinate conclusions of fact nor as to how he arrived at the precise scale of reasonable charges which he fixed, yet his conclusion does not appear to be baseless or arbitrary, but reasonable and fair.

### Findings of Fact.

The testimony as to the cost of hauling the logs satisfies us that the master's finding of a reasonable charge affords compensation to the carrier. It may be that trainloads might have been carried profitably at a less rate, but the traffic as a whole could not be carried for much less. Whether compensation should not be more liberal gives us the most concern. In view of the experience of the Interstate Commerce Commission and its full and repeated consideration of these very rates, we should have inclined to think the rates which they fixed, first for interstate traffic and then for intrastate traffic on logs, ought to be accepted as the fair charge. Against this, however, is the thought that they were not dealing with past transactions but attempting to fix a future rate to which carriers and shippers ought to conform themselves, and the fact is strong that the low rates were voluntarily established and maintained over a long period by the carrier, and on the faith of them these claimants had made investments and established businesses which would be and were very disastrously affected by a sudden and drastic raising of rates. While the carrier was not bound to continue the low rates at a loss, and could demand compensatory rates, a just and reasonable regard to the entire situation makes against a sudden increase of more than 100 per cent. on a traffic in which freight costs are a large part of the value of the product shipped. If the ideal rates be those fixed by the Commission, the ideal might with reason and justice have been approached less precipitately. The just compensation as fixed by the master, applicable of course only to these past transactions, affords reimbursement for all fair elements of cost and a fair profit. His figure approximates the intrastate rates on logs in Georgia and North Carolina, and is some lower than in Alabama and South

48

Carolina. We think the master's conclusion is just, and we affirm it.

We therefore overrule all exceptions of all parties to the report, and direct that a decree be prepared upon the basis of the conclusions of law and findings of fact under the original and supplemental reports.

BARRETT, District Judge, concurs.

UNDERWOOD, District Judge.
I respectfully dissent.