STATE OF FLORIDA et al. v. UNITED STATES et al.

WILSON CYPRESS CO. et al. v. SAME.

F. S. BUFFUM CO., Inc., v. SAME.

Nos. 690, 691, 695.

District Court, N. D. Georgia, Atlanta Division. Feb. 24, 1933.

See, also (D. C.) 30 F.(2d) 116; (D. C.) 31 F.(2d) 580.

Cary D. Landis, Atty. Gen., for the State of Florida.

Theo. T. Turnbull, of Tallahassee, Fla., for complainant Florida Railroad Commission.

Henry P. Adair and F. C. Hillyer, both of Jacksonville, Fla., J. Van Dyke Norman, of Louisville, Ky., and August G. Gutheim, of Washington, D. C., for other complainants.

478

Elmer B. Collins, Sp. Asst. to Atty. Gen., for the United States.

J. Stanley Payne, Asst. Chief Counsel, Interstate Commerce Commission, of Washington, D. C., for defendant Interstate Commerce Commission.

Robert C. Alston, of Atlanta, Ga., for Atlantic Coast Line R. Co., intervening defendant.

SIBLEY, Circuit Judge, and UNDERWOOD and STRUM, District Judges.

Three bills were filed against the United States and Interstate Commerce Commission, one by the state of Florida and the Florida Railroad Commission, another by Wilson Cypress Company and Wilson Lumber Company, and the third by F. S. Buffum & Co., Inc. Each upon similar allegations seeks to set aside and enjoin an order of the Interstate Commerce Commission made July 5, 1932, and amended July 28, 1932, whereby rates were prescribed for the intrastate carload shipments in Florida of logs of certain classes conforming to rates established as reasonable for like shipments in interstate commerce between Florida and Georgia. The Atlantic Coast Line Railroad Company, the carrier whose rates were involved, intervened. After the grant of an order suspending the operation of the rates the bills were by consent consolidated and heard before a court of three judges on the pleadings and on the evidence submitted.

### Findings of Fact.

The attacked order of the Commission is its final judgment on a proceeding instituted in 1926 by the Georgia Public Service Commission to which the complainant and intervener in the present bills became parties. The then existing interstate rates on logs between Florida and Georgia were complained of, and the Florida intrastate rates referred to as the Cummer Scale were attacked as causing undue prejudice to persons and places in Georgia in their commerce with Florida, and unjust discrimination against interstate commerce under section 13 of the Interstate Commerce Act (49 USCA § 13). After lengthy hearings, on August 2, 1928, reasonable interstate rates were fixed, and upon a general finding that the intrastate rates in question caused discrimination against interstate commerce an intrastate rate was prescribed to conform to the new interstate rates. Georgia Public Service Comm. v. Atlantic Coast Line R. Co., 146 I. C. C. 717. On attack in this court against that part of the order fixing the intrastate rate it was upheld as justified for the removal of discrimination against persons and places in Georgia by confining its application to north Florida. State of Florida v. U. S. (D. C.) 30 F.(2d) 116. The order was, however, clarified by the Commission so as to require its application to the entire state, and upon further attack it was upheld as proper to remove a discrimination against the general interstate commerce of the carrier in that state rates were so low as to be unremunerative and to burden the revenues of the carrier. State of Florida v. U. S. (D. C.) 31 F.(2d) 580. On appeal the Supreme Court declined to consider the evidence, but reversed the judgment because there were not distinct findings by the Commission of the facts going to show such discrimination by a burden on revenues, the court holding that the general finding that there existed a discrimination against interstate commerce in the language of section 13 (4) of the act (49 USCA § 13 (4) was insufficient to authorize the Commission to exercise its powers under that section; but it was suggested that such findings might yet be made upon proper evidence. State of Florida v. U. S., 282 U. S. 194, 51 S. Ct. 119, 75 L. Ed. 297. This court accordingly entered its decree setting aside and annulling the portion of the order complained of. Thereupon the Georgia Public Service Commission and the Atlantic Coast Line Railroad Company on due notice to all parties, including the present complainants, moved the Interstate Commerce Commission to reopen the case before it, which over objection was done, and much new evidence was added to that previously taken. A motion was made by the present complainants at the beginning of the hearing to dismiss the proceedings as respects any issue of burden on the revenues of the carrier, and to exclude all evidence directed to that contention. The motions were overruled by the Examiner, and again by the full Commission, which after argument made an elaborate and lengthy report of its findings, put aside the question of undue prejudice by the state rates to persons and places in Georgia as unnecessary to be decided, but held the rates to be burdensome on the interstate carrier's revenues and thus a discrimination against interstate commerce, which it removed by again prescribing under section 13 (4) of the act future state rates to conform to the interstate rates which it had established as reasonable. Georgia Public Service Comm. v. Atlantic Coast Line R. Co., 186 I. C. C. 157.

We find the conclusions of fact in the

Commission's report to be well supported by the evidence, and such as we would ourselves make therefrom. Referring to that report for details, we summarize the ultimate facts most material to the present issues. The state rates known as the Cummer Scale were voluntarily established in substance in 1903 and 1904 by Jacksonville & Southwestern Railroad Company, when railroad and timber to be transported were owned by the same interests. The rates were inherited by the Atlantic Coast Line Railroad Company on purchasing the railroad involved, and were by it applied as carload rates over all its lines in Florida in 1914. The Florida Railroad Commission at the time asserted that it did not approve the rates though perforce it allowed them, considering them too low and even confiscatory if involuntarily enforced. They apply on no other railroad in Florida. In 1928 and 1932 comparisons of these rates with other rates on logs and on similar traffic in the same and neighboring territories showed them to average less than half of most other comparable interstate and intrastate rates, and to be much the lowest of any of them. They are about one-half the rates fixed by the Interstate Commerce Commission for interstate traffic in the same logs in substantially the same territory. On the question of the cost of the service, figures were considered which showed the average cost of hauling logs over the Coast Line System; exact figures for the particular traffic in Florida not being available. But it appeared that the cost of the service in Florida was probably higher than elsewhere. It was found that there was no profit but an out-of-pocket loss to the carrier in the log traffic under these rates, not considering taxes and return on the investment, and that consequently there was no contribution to the maintenance of the carrier as an efficient instrumentality of commerce, but a drain upon it. The total amount of this drain before 1929 was not found, nor could it be approximated from the evidence. But for the two years, 1929 and 1930, when the interstate rates fixed by the Interstate Commerce Commission were enforced, the log traffic under them was 18,602 cars and the the gross revenue from this intrastate traffic was $571,508.94, whereas if the Cummer Scale had been applied it would have been $281,225.75. Although the traffic fell off greatly during this period, it is found to be more due to the universal depression in business and to the moving of mills to the timber than to the raise in rates, because there was no substantial increase after the

Cummer rates were restored following the decision of the Supreme Court above referred to. Abundant available timber still exists in Florida, and is being rapidly reproduced, so that the future traffic will likely amount to at least 7,431 cars per year, and the average gross revenue on it under the new rates will be more than $100,000 per year greater than the Cummer Scale would yield, thus converting a loss on the business into a profit of that approximate amount. As showing that the carrier as an instrumentality of interstate commerce cannot afford to absorb the loss under the Cummer Scale, or to forego the support to be derived from the new scale, it is found that the carrier's net return on its investment is steadily falling from year to year, and in 1930 was only 2.54 per cent. On these findings the general finding was made that the Cummer rates are and in future will be unjustly discriminatory against interstate commerce, and that such unjust discrimination can and should be removed by rates not less than the scale prescribed for interstate commerce. Pending this litigation in October, 1932, the Commission reopened its order and took further evidence which showed that many voluntarily reduced rates had been established since the order by other carriers on low-grade traffic in raw materials comparable to the log rates in dispute, in the western part of the southern territory and in southwestern territory. It found, and the evidence well warranted the finding, that the reductions were a temporary experiment made in the effort to recapture traffic which had been taken away by trucks, and generally the lowered rates carried an obligation that the manufactured article should also be moved by the carrier making the rate. The experiment has met with but little success. No such rates exist in the Florida territory here involved; nor is truck competition there such as to make unremunerative rates judicious as likely to improve net revenues. On January 9, 1933, the Commission reaffirmed its order of July 5, 1932.

### Conclusions of Law.

We are of opinion that the particular findings are sufficient to support the general finding of unjust discrimination by the state rates against interstate commerce by undue burden on the interstate carrier's revenues, and to justify an order removing the discrimination by establishing the new rate prescribed.

The contention is vigorously renewed that the proceeding before the Commission

never was one in which a burden by the state rates on the revenues of the carrier was made an issue, so that the Commission could properly so find and on that ground prescribe a state rate under section 13 (4) of the act. We adhere to the views expressed in our former decisions, 30 F.(2d) 116; 31 F.(2d) 580. It is true that the Georgia Public Service Commission in its original complaint did not ask that the Florida state rates be raised, and it rather preferred that interstate rates should be lowered, but the complainant directly challenged the state rates, alleged that they caused a discrimination against interstate commerce within section 13 of the act, and prayed for its removal. The state of Florida was duly notified as required by that section, and on full hearing discrimination was found to exist and sought to be removed by prescribing a new state rate by virtue of section 13 (4). This court held that discrimination by revenue burden was within the case before the Commission, and upheld the order on that ground only. The Supreme Court, 282 U. S. at page 209, 51 S. Ct. 119, 123, 75 L. Ed. 297, so far from disagreeing, said: "As the Florida Railroad Commission appeared in defense of the intrastate rates, and the railroad company, the rates of which were in question, and other parties in interest, both shippers and carriers, were heard, the question now presented relates to the substance of the determination of the Commission and its support in the evidence rather than to mere matters of pleading and procedure. In making its order, the Commission could exercise all the authority conferred by the Interstate Commerce Act for the purpose of removing such unjust discrimination as was found to exist. If the Commission had made adequate findings supported by evidence upon the point under consideration, we should not be disposed to conclude that the order must be upset because of the manner in which the proceeding was initiated or of the generality of the allegations of the complaint." Much more forcibly do these words apply, now that the parties have had another full hearing upon this precise issue, with full knowledge that courts and Commission regarded that issue not only as present, but as controlling; the Commission having in due form found that the state rates do cause an unjust discrimination against interstate commerce by the very words of section 13 (4): "It shall prescribe the rate * * * thereafter to be charged * * * in such manner as, in its judgment, will remove such * * * discrimination." It is the judgment of the Commission and not the wish or the prayers of the Georgia State Commission that is to determine what shall be done about the discriminatory state rate.

Early in the reopened proceedings before the Commission the complainants made a written demand on Atlantic Coast Line Railroad Company that it produce a statement supported by individual car record movements, showing certain details as to cars of logs moving on its lines between points in Florida and Georgia for each of the years 1926, 1927, 1928, 1929, and 1930, a like statement concerning cars moving within the state of Florida for each of those years, and a statement showing the gross earnings from both interstate and intrastate shipments of such logs for each of those years. The railroad company in answer stated that it expected to furnish certain appropriate data about its log traffic, but could not get up the statements requested for lack of time and because its records did not show the distinctions in log traffic required. The railroad company did produce details of its log traffic since 1928, but not before. The Commission refused to compel further compliance. It will be noted that no specified books or papers were asked to be produced, nor any specified witness called on to tell what he might know. We are aware of no rule of law or practice which would require a litigant laboriously to compile information for his adversary, even if it were in his power to do so. Certainly it would lie in the discretion of the tribunal to decline to compel it. We find in such refusal no cause to upset an order founded on evidence which was duly produced before that tribunal.

But it is said that the information demanded was essential to a finding of unjust discrimination, the revenue before 1929 under the state rates being one of the things mentioned by the Supreme Court as necessary to be established. We do not understand that the revenue, either gross or net, produced by the state rates must be exactly established, but only that the operation of those rates and their effect upon the carrier must be investigated and found. It was here established that the state rates produced a loss, and were a drain on the carriers. It might have been desirable to show the extent of the loss, but if that be impracticable, and if it appear that the loss will be in the future substantial and the carrier is not in position to absorb it without detriment to his service and support as an interstate carrier, a

sufficient case is made to find an unjust discrimination against interstate commerce, and to require its correction.

■ The ascertainment of the general fact of loss is said to be unlawful because the witnesses and the Commission dealt in part with the average costs of similar service over the Coast Line System and the general cost of hauling freight in the division which substantially embraces the state of Florida, rather than the actual cost of hauling logs in Florida. But it was shown that the latter information could not be gotten; that the cost of service in Florida for reasons given was greater than elsewhere in the System, so that average costs for the System really showed a less cost than the Florida costs if they could have been separately ascertained. The difference in cost between hauling logs and other carload freight was also given attention. Not infrequently the best evidence obtainable has to be used as a basis for inferences, and conclusions of fact made therefrom with due allowance for possible inaccuracies are not invalidated because the best evidence logically possible was not at hand.

Appendix E of the report, entitled "Estimated Costs of Transporting Logs in Florida for the Average Distance of 81.36 miles based on A. C. L. Average Costs per Unit for Calendar Year 1929 Applied to the Average Units Involved in Hauling Logs in that State," is attacked as being evidence considered by the Commission which was not introduced in the proceeding so that opportunity should be given to the parties to meet it, contrary to Interstate Commerce Commission v. Louisville & Nashville R. R., 227 U. S. 88, 33 S. Ct. 185, 57 L. Ed. 431. We do not understand the appendix to be evidence considered by the Commission. It is rather the Commission's conclusion as to the cost of hauling logs in Florida for the distance shown to be the average under the Cummer Scale, based on the evidence which had been produced to it as tending to show such cost. So far from vitiating the order made it rather tends to show the care and discrimination with which the inexact evidence of cost was examined and considered.

■ A contention strongly urged is that the direct prescription by the Interstate Commerce Commission of the intrastate rate is prima facie an unconstitutional invasion of the province of the state, so that the burden is on the defendants here to justify it before the court, and that in order to justify it the facts of justification, to wit, those showing the state rate to be an unjust discrimination against interstate commerce, must clearly appear to this court, the findings of the Commission not being conclusive, nor in themselves weighty on the very point of the Commission's jurisdiction. It is not doubted that the power of the Commission to make an order is a judicial question, and that the court may examine it independently. When, however, the very fact upon the existence of which the power to act depends has been contradictorily tried before the Commission itself, its conclusion fully expressed upon its record affirming the existence of the fact is certainly sufficient to put the burden upon those who deny it. While at one time all findings of the Commission were declared by the statute to be only prima facie evidence of their correctness, that language has now been retained only with reference to money awards and to valuation of property by the Commission, and it is well established that under the enlarged and positive powers with which the Commission is now vested its findings of fact within the scope of its powers will not be reviewed by the courts if supported by evidence. Merchants' Warehouse Co. v. United States, 283 U. S. 501, 51 S. Ct. 505, 75 L. Ed. 1227. Where the matter examined relates to its power to act at all the decisions are perhaps not so explicit, but we may refer to the following expressions of the court as bearing directly upon it: In I. C. C. v. Northern Pacific R. R. Co., 216 U. S. 538, 544, 30 S. Ct. 417, 418, 54 L. Ed. 608, it was said: "We are of opinion, then, that the Commission had no power to make the order if a reasonable and satisfactory through route already existed, and that the existence of such a route may be inquired into by the courts. How far the courts should go in that inquiry we need not now decide. No doubt, in complex and delicate cases great weight, at least, would be attached to the judgment of the Commission." In Interstate Commerce Commission v. Union Pacific R. R. Co., 222 U. S. 541, 547, 32 S. Ct. 108, 111, 56 L. Ed. 308, in discussing fundamental questions of the constitutional and statutory power of the Commission, it was said: "In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. * * * Its conclusion, of course, is subject to review, but, when supported by evidence is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof, but the courts will not examine the facts further than to determine whether there

was substantial evidence to sustain the order." In Interstate Commerce Commission v. L. & N. R. R. Co., 227 U. S. 88, 33 S. Ct. 185, 57 L. Ed. 431, the court held that the power of the Commission to alter rates depended upon the fact of their unreasonableness, but that the Commission having found on evidence that they were excessive, its order was not to be disturbed. In United States v. L. & N. R. R. Co., 235 U. S. 314, 320, 35 S. Ct. 113, 114, 59 L. Ed. 245, the language is: "It is not disputable that from the beginning the very purpose for which the Commission was created was to bring into existence a body which, from its peculiar character, would be most fitted to primarily decide whether from facts, disputed or undisputed, in a given case, preference or discrimination existed. * * * And the amendments by which it came to pass that the findings of the Commission were made not merely prima facie but conclusively correct in case of judicial review, except to the extent pointed out in the [Interstate Commerce Commission v.] Illinois Central [R. Co., 215 U. S. 452, 30 S. Ct. 155, 54 L. Ed. 280] and other cases, supra, show the progressive evolution of the legislative purpose and the inevitable conflict which exists between giving that purpose effect and upholding the view of the statute taken by the court below. It cannot be otherwise since if the view of the statute upheld below be sustained, the Commission would become but a mere instrument for the purpose of taking testimony to be submitted to the courts for their ultimate action." We need not decide whether in this case the Commission's finding of unjust discrimination is entitled to any less weight because it is a prerequisite of its jurisdiction as well as the meritorious basis for its exercise, because we have examined the evidence independently and are led to the same conclusion that the unjust discrimination exists.

In the evidence of lower voluntary rates recently made by other carriers in other territory we find nothing to require a different conclusion. A situation may thereby arise requiring inquiry as to other discriminations, but it throws little light on the revenue problem of the Atlantic Coast Line Railroad Company as an interstate carrier. If log traffic done in Florida on the Cummer Scale is at an out-of-pocket loss, the less of it done the better. The destruction of it would help by stopping a loss. If but a little business be done on remunerative rates so much profit would be substituted. The Commission has given full and expert attention to the situation, and has found that adherence to the level of log rates it has previously established as reasonable in interstate commerce and has applied as a minimum in intrastate commerce in Florida should be continued. We find no such plain case to the contrary as to warrant court interference. The findings and the evidence show the Cummer Scale of rates to constitute such a substantial revenue burden on the interstate carrier and on interstate commerce as to cause a discrimination against the latter and to give the Commission power to remove it under Interstate Commerce Act, § 13 (4). The action to be taken in removing it is left by the section to the judgment of the Commission. It having power in this case to prescribe a proper intrastate rate, its judgment as to the level of the rate to be established in order to accomplish the desired revenue result ought not to be overridden when sustained by evidence and violative of no law. We uphold the orders of the Commission.