ATLANTIC COAST LINE RAILROAD CO. *v.* FLORIDA ET AL.*

No. 344. Argued January 17, 18, 1935. Reargued March 4, 5, 1935.—Decided April 29, 1935.

---

* Together with No. 345, *Florida et al.* v. *United States et al.* Appeal from the District Court of the United States for the Northern District of Georgia.

302

*Messrs. Carl H. Davis* and *Robert C. Alston* made the arguments at both hearings, on behalf of the Atlantic Coast Line Railroad Company, appellant in No. 344 and cross-appellee with the United States and the Interstate Commerce Commission in No. 345. *Messrs. W. E. Kay* and *Wm. Hart Sibley,* of counsel for the Atlantic Coast Line Railroad Company, were with them on the briefs. *Mr. Alfred P. Thom,* of counsel for the Atlantic Coast Line Railroad Company, also was on the original brief.

*Messrs. C. G. Ashby* and *Henry P. Adair* argued the case on the first hearing, for the Brooks-Scanlon Corporation, the Wilson Cypress Company, and the Cummer Cypress Company, which together with the State of Florida, the Florida Railroad Commission (individually and for the use and benefit of several shippers), and the Wilson Lumber Company, were appellees in No. 344 and cross-appellants in No. 345. The reargument was made by *Mr. Henry P. Adair* and *Mr. J. V. Norman,* the latter appearing as counsel for the Wilson Lumber Company. With *Messrs. Ashby, Adair,* and *Norman* on the briefs were *Mr. Cary D. Landis,* Attorney General of Florida, for the State of Florida; *Mr. Theodore T. Turnbull,* for the Florida Railroad Commission; and *Mr. August G.*

*Gutheim,* of counsel for the Brooks-Scanlon Corporation, the Wilson Cypress Company, and the Cummer Cypress Company.

Mr. Justice Cardozo delivered the opinion of the Court.

Freight charges were collected by a railroad carrier in accordance with an order of the Interstate Commerce Commission after the refusal of a United States District Court to declare the order void. Later the decree was reversed by this court without considering the evidence on the ground that the findings of the Commission were incomplete and inadequate. *Florida* v. *United States,* 282 U. S. 194. Still later the Commission upon new evidence and new findings made the same order it had made before, this court confirming its action after appropriate proceedings. *Florida* v. *United States,* 292 U. S. 1. The question now is whether restitution is owing from the carrier for the whole or any part of the rates collected from its customers while the first order was in force. The narrative must be expanded to bring us to an answer.

For many years, beginning with 1903, the Atlantic Coast Line Railroad Company or its predecessor maintained a schedule of charges known as the Cummer scale for the transportation of logs in train and carload shipments within the state of Florida. In its inception this scale was established by agreement between the railroad company and one or more companies engaged in the sale of lumber. Later, in January, 1927, an order was made by the Railroad Commission of Florida whereby voluntary rates then in force, if not higher than the maximum rates approved by the Commission, were to be continued in effect as if officially prescribed. For the purpose of the present controversy we assume that by force of this order, the Cummer scale, even though less than compensatory, and even

though voidable through appropriate action, must be deemed to have been fixed by law for intrastate transactions.

In May, 1926, the Public Service Commission of Georgia filed a complaint against the Atlantic Coast Line Railroad Company with the Interstate Commerce Commission, the complaint being directed to the maintenance of the Cummer scale. In that proceeding the Railroad Commission of Florida intervened, and also important shippers affected by the challenged schedule. On August 2, 1928, the Interstate Commerce Commission made a decision (146 I. C. C. 717), amended and broadened on February 7, 1929, enjoining the maintenance of the schedule then in force on the ground (along with others) that the rates were so low as to result in unjust discrimination against interstate commerce. To avoid this discrimination a new schedule was established. Florida and the intervening shippers brought suits in a federal district court, made up of three judges in accordance with the statute (28 U. S. C. § 47), to vacate the orders of the Commission and restrain enforcement. The District Court dismissed the bills. 30 F. (2d) 116; 31 F. (2d) 580. Upon appeal to this court the decrees were reversed on the ground that the report of the Commission did not contain the necessary findings. 282 U. S. 194. It was not enough to find that the intrastate rates were unreasonably low. 282 U. S. at p. 214. It was not enough to state the conclusion that interstate commerce was unjustly affected. 282 U. S. at p. 213. It was necessary to find the facts supporting the conclusion, as, for instance, that the revenues of interstate commerce would probably be increased if the rates for intrastate hauls were established at a higher level. " In the absence of such findings, we are not called upon to examine the evidence in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit." 282 U. S. at p. 215. The Com-

mission was to be free, however, to consider the facts anew and file its report in proper form. It " is still at liberty, acting in accordance with the authority conferred by the statute, to make such determinations as the situation may require." The mandate of reversal, giving effect to that decision, went down from this court on February 19, 1931, and on March 7, 1931 was filed in the court below.

In the interval between February 8, 1929, the effective date of the new schedule, and March 7, 1931, the railroad company had made collections in accordance with the order of the Commission, discarding the Cummer scale. Indeed, the Florida Commission, bowing to the authority of the Interstate Commerce Commission, had made an order in January, 1929, amended in April of that year, whereby the Cummer scale was declared to be suspended so long as the decree of the District Court remained in effect and unreversed. After the mandate of reversal the Interstate Commerce Commission listened to new evidence, made a new set of findings, and prescribed the same rate that it had put into effect before. 186 I. C. C. 157; 190 I. C. C. 588. The basis of the decision was the unjust discrimination suffered by interstate commerce through losses of revenue resulting from the local rates. Once more the order of the Commission (dated July 5, 1932, but not effective till February 25, 1933) was assailed by Florida and by shippers through suits in the District Court. The bills were dismissed, 4 F. Supp. 477, and this court affirmed. .292 U. S. 1. Both the findings of the Commission and the evidence back of the findings were now held to be sufficient.

In the meantime other proceedings had been taken in the District Court with a view to giving effect more completely to the mandate of reversal. In February and March, 1931, shippers of lumber, interveners in the earlier suits, petitioned for a decree of restitution to the extent of the difference between the rates that had been

paid from February 8, 1929, to March 7, 1931, under the order of the Commission, and the lower rates that would have been paid if there had been adherence to the Cummer scale. At the same time the State of Florida and its Railroad Commission petitioned for like relief in behalf of other shippers and consignees. An answer having been filed by the railroad company, the District Court appointed a master to take evidence and report. After intermediate proceedings which it is unnecessary to summarize, the master made a final report in March, 1933, recommending a decree of restitution for part but only part of the overcharges claimed. He found that the Cummer scale was unjust and noncompensatory, and if enforced against the will of the carrier would result in confiscation. He found that for the years in controversy a substituted rate should be established, and established at such a figure as would avoid unjust discrimination against interstate commerce. He found that this end could be attained by the adoption of a schedule higher than the Cummer scale but lower than the one promulgated by the Commission as operative thereafter. He advised restitution in the sum of $99,941.77, which was 34% of the amount ($293,946.38) demanded by the claimants. The District Court confirmed the report, one judge dissenting. The prevailing opinion gives expression to the hesitation of the court in thus departing from the findings of the federal commission. It observes, however, that there would be hardship to shippers and consignees in a sharp and sudden change of rates directed to a business in which freight charges are so large a part of the value of the product. "If the ideal rates be those fixed by the Commission, the ideal might with reason and justice have been approached less precipitately." The case is here on cross-appeals. *Arkadelphia Milling Co.* v. *St. Louis Southwestern Ry. Co.,* 249 U. S. 134; *Baltimore & Ohio R. Co.* v. *United States,* 279 U. S. 781. In No. 344, the appellant is the

railroad company, which declares itself aggrieved because restitution was not denied altogether. In No. 345, the appellants are the State of Florida and intervening shippers, who declare themselves aggrieved because restitution was not awarded on the basis of the Cummer scale.

Decisions of this court have given recognition to the rule as one of general application that what has been lost to a litigant under the compulsion of a judgment shall be restored thereafter, in the event of a reversal, by the litigants opposed to him, the beneficiaries of the error. *Arkadelphia Co.* v. *St. Louis Southwestern Ry., supra; Northwestern Fuel Co.* v. *Brock,* 139 U. S. 216; *Ex parte Lincoln Gas & Electric Light Co.,* 257 U. S. 6; cf. *Haebler* v. *Myers,* 132 N. Y. 363; 30 N. E. 963. Indeed, the concept of compulsion has been extended to cases where the error of the decree was one of inaction rather than action, as where a court has failed to set aside the order of a commission or other administrative body, the constraint of the order being imputed in such circumstances to the refusal of the court to supply a corrective remedy. *Baltimore & Ohio R. Co.* v. *United States, supra.* But the rule, even though general in its application, is not without exceptions. A cause of action for restitution is a type of the broader cause of action for money had and received, a remedy which is equitable in origin and function. *Moses* v. *Macferlan,* 2 Burr. 1005; *Bize* v. *Dickason,* 1 Term Rep. 285; *Farmer* v. *Arundel,* 2 Wm. Bl. 824; *Kingston Bank* v. *Eltinge,* 66 N. Y. 625.* The claimant to prevail must show that the money was received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it. *Schank* v. *Schuchman,* 212 N. Y. 352, 358, 359; 106 N. E. 127; *Western Assurance Co.* v. *Towle,* 65 Wis. 247; 26

---

* Many cases are assembled in Keener on Quasi-Contracts, pp. 412, 417, and Woodward on Quasi-Contracts, § 2.

N. W. 104. The question no longer is whether the law would put him in possession of the money if the transaction were a new one. The question is whether the law will take it out of his possession after he has been able to collect it. Cf. *Tiffany* v. *Boatman's Institution*, 18 Wall. 375, 385, 390. The ruling in *Western Assurance Co.* v. *Towle, supra*, gives point to the distinction. The plaintiff had paid money to the defendant upon a policy of insurance against fire. The payment was procured by false representations and false swearing as to the extent of the loss, which, if seasonably discovered, would have worked a forfeiture of the policy. The court held that in an action for money had and received, the plaintiff could recover "so much only as the amount paid exceeded the actual loss sustained by the insured"; in equity and good conscience the rest might be retained.

Suits for restitution upon the reversal of a judgment have been subjected to the empire of that principle like suits for restitution generally. "Restitution is not of mere right. It is *ex gratia*, resting in the exercise of a sound discretion, and the court will not order it where the justice of the case does not call for it, nor where the process is set aside for a mere slip." *Gould* v. *McFall*, 118 Pa. St. 455, 456; 12 Atl. 336, citing *Harger* v. *Washington County*, 12 Pa. St. 251. There are other decisions to the same effect. *Alden* v. *Lee*, 1 Yeates (Pa.) 207; *Green* v. *Stone*, 1 Har. & J. (Md.) 405; *State* v. *Horton*, 70 Neb. 334; 97 N. W. 434; *Teasdale* v. *Stoller*, 133 Mo. 645, 652; 34 S. W. 873. "In such cases the simple but comprehensive question is whether the circumstances are such that equitably the defendant should restore to the plaintiff what he has received." *Johnston* v. *Miller*, 31 Gel. & Russ. 83, 87.

We are thus brought to the inquiry whether the rates under the new schedule were collected in such circumstances as to move a court of equity, finding the proceeds

of collection in the possession of the carrier, to help the shippers and their representatives in getting the money back.

This court has held that the Interstate Commerce Commission has jurisdiction exclusive of that of any court to set aside intrastate rates which discriminate unduly against interstate commerce. *Board of Railroad Commissioners* v. *Great Northern Ry. Co.,* 281 U. S. 412. Even so, the substituted schedule is prospective only, and power has not been granted in such circumstances to give reparation for the past. 281 U. S. at p. 423; *Robinson* v. *Baltimore & Ohio R. Co.,* 222 U. S. 506, 511. What was done in this case must be considered in the light of that established rule. An order declaring the discrimination to be excessive and unjust was made by the Commission before the carrier attempted to collect the higher charges. Thereafter the order was adjudged void by a decision of this court (*Florida* v. *United States,* 282 U. S. 194; cf. *United States* v. *Baltimore & Ohio R. Co.,* 293 U. S. 454, 464; *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499), but void solely upon the ground that the facts supporting the conclusion were not embodied in the findings. Void in such a context is the equivalent of voidable. *Toy Toy* v. *Hopkins,* 212 U. S. 542, 548; *Weeks* v. *Bridgman,* 159 U. S. 541, 547; *Ewell* v. *Daggs,* 108 U. S. 143, 148, 149. The carrier was not at liberty to take the law into its own hands and refuse submission to the order without the sanction of a court. It would have exposed itself to suits and penalties, both criminal and civil, if it had followed such a path. See, e. g., Interstate Commerce Act, 49 U. S. C., § 16 (8) (9) (10) (11). Obedience was owing while the order was in force.

By the time that the claim for restitution had been heard by the master and passed upon by the reviewing court, the Commission had cured the defects in the form of its earlier decision. During the years affected by the

claim there existed in very truth the unjust discrimination against interstate commerce that the earlier decision had attempted to correct. If the processes of the law had been instantaneous or adequate, the attempt at correction would not have missed the mark. It was foiled through imperfections of form, through slips of procedure (*Gould v. McFall, supra; Alden v. Lee, supra*), as the sequel of events has shown them to be. Unjust discrimination against interstate commerce, " forbidden " by the statute, and there " declared to be unlawful," (Interstate Commerce Act, § 13 (4); *Board of Railroad Commissioners* v. *Great Northern Ry. Co., supra,* at pp. 425, 430; *Florida* v. *United States,* 292 U. S. 1, 5) does not lose its unjust quality because the evil is without a remedy until the Commission shall have spoken. The word when it goes forth invested with the forms of law may fix the consequences to be attributed to the conduct of the carrier in reliance upon an earlier word, defectively pronounced, but aimed at the self-same evil, there from the beginning. The Commission was without power to give reparation for the injustice of the past, but it was not without power to inquire whether injustice had been done and to make report accordingly. Indeed, without such an inquiry and appropriate evidence and findings, its order could not stand, though directed to the years to come. Obedient to this duty, the Commission looked into the past and ascertained the facts. In particular it looked into the very years covered by the claims for restitution and found the inequality and injustice inherent in the Cummer rates during the years they were in suspense and during those they were in force. 186 I. C. C. 157, 166, 167, 168, 187. What it had stated in its first report (146 I. C. C. 717) was thus supplemented and confirmed by what it stated in the second. The two sets of findings tell us, when read together, that restitution is without support in equity and

conscience, whatever support may come to it from procedural entanglements.

The carrier's position takes on an added equity when the fact is borne in mind that the charges of the Cummer schedule are less than compensatory, and would result in confiscation if enforced by the power of the State after challenge by the carrier in appropriate proceedings. What those proceedings are has been a subject of dispute under the Florida decisions. For many years it was believed that a carrier objecting to a schedule as unreasonably low, might put another into effect without asking the consent of any one, and justify its conduct later if a contest should develop. *Pensacola & A. R. Co.* v. *State,* 25 Fla. 310; 5 So. 833; *Cullen* v. *Seaboard Air Line R. Co.,* 63 Fla. 122; 58 So. 182. The shippers and the state of Florida contend that by a very recent decision this practice has been ended. *Reinschmidt* v. *Louisville & Nashville R. Co.,* 118 Fla. 237; 160 So. 69. The present rule is said to be that the carrier must resort in the first place to an administrative remedy before the Railroad Commission of the state, and look to the courts afterwards. If all this be accepted, the conclusion does not follow that the confiscatory character of a schedule is not to be considered in determining the equity of the carrier's possession when higher rates have been collected under color of legal right and consignees or shippers are trying to regain what they have paid. In saying this we do not forget that the Cummer scale of rates was voluntary in origin. Later, by an order of the state commission, it became a scale prescribed by law. Whatever voluntary quality it then retained must be deemed to have departed when the carrier made common cause with the critics of the scale in contesting its validity.

The claim for restitution yields to the impact of these converging equities with all their cumulative power. It

314

would yield to such an impact though the action to which it is an incident were triable in a court of law. *Moses* v. *Macferlan, supra; Schank* v. *Schuchman, supra.* It must yield more swiftly and surely when the litigants are in a court of equity. *Tiffany* v. *Boatman's Institution, supra; Willard* v. *Tayloe,* 8 Wall. 557; *Mississippi & M. R. Co.* v. *Cromwell,* 91 U. S. 643, 645; *Deweese* v. *Reinhard,* 165 U. S. 386, 390. The right that equity declines to further may have its origin in contract. But also, and in typical instances, it has its origin in statute. *Tiffany* v. *Boatman's Institution, supra.* The tests of conscience and fair dealing will be the same in either case. This District Court whose decree we are reviewing was organized to pass upon the question whether the challenged order of the Commission should be vacated or upheld. 28 U. S. C. § 47. Whatever power it has to compel restitution by the carrier of items subsequently collected derives from that primary jurisdiction and is ancillary thereto. In the exercise of that power it is not required to lend its aid in perpetuating a forbidden practice. Florida has no equity other than the equities of the consignees and shippers. The consignees and shippers have no equity that can override a prohibition and a policy declared by act of Congress. To prevail, the claimants must make out that in the circumstances here developed a fixed and certain duty has been laid upon a court of equity to make the carrier pay the price of the blunders of the commerce board in drawing up its findings. The blunders being now corrected, the verities of the transaction are revealed as they were from the beginning. We think the better view is that in the light of its present knowledge the court will stay its hand and leave the parties where it finds them.

To this the claimants answer that inaction in such circumstances is an assumption by the federal court of legislative powers and an unconstitutional encroachment upon the powers of a sovereign State. The argument

misses the significance of equitable remedies. The federal court by its inaction does not trench upon any jurisdiction, legislative or judicial, inherent in the state of Florida. It does not undertake to say that the rates collected by the carrier were lawful in the sense that a suit would lie to recover them if credit had been given to the shipper and a balance were now unpaid. All that the federal court does is to announce that it will stand aloof. It inquires whether anything has happened whereby a court of equity would be moved to impose equitable conditions upon equitable relief. In the course of that inquiry it perceives that the charges were collected under color of legal right, in circumstances relieving the carrier of any stigma of extortion. It discovers through the evidence submitted to the Commission and renewed in the present record that what was charged would have been lawful as well as fair if there had been no blunders of procedure, no administrative delays. Learning those things, it says no more than this, that irrespective of legal rights and remedies it will not intervene affirmatively, in the exercise of its equitable and discretionary powers, to change the *status quo*. This is not usurpation. It is not action of any kind. It is mere inaction and passivity in line with the historic attitude of courts of equity for centuries.

' The claimants refer to cases in which this court has denied the power of the federal judiciary to take upon itself the functions of a rate-making body, charged with legislative duties. None of the cases cited controls the case at hand. A typical illustration is *Central Kentucky Natural Gas Co.* v. *Railroad Commission*, 290 U. S. 264. Rates prescribed by a state commission for the furnishing of gas were found by a federal court to be below the line of compensation. In the face of that finding the decree refused relief unless the complainant would consent to abide by a new schedule established by the court itself. Upon appeal to this court the condition was annulled.

316

We gave explicit recognition to the power of a court of equity to subject an equitable remedy to equitable terms. We held, however, that full protection could be accorded to seller and consumer if the regulatory Commission were permitted to discharge its proper function of prescribing a just schedule after the unlawful one had fallen. " In the circumstances there was no occasion for the court to draw upon its extraordinary equity powers to attach any condition to its decree, and the condition which it did attach was an unwarranted intrusion upon the powers of the Commission." 290 U. S. at p. 273.

A very different situation is shown to us here. A complex of colorable right and procedural mistake has brought about a situation in which the equities of the carrier, if they are not protected by the court, will be unprotected altogether. The rates now recognized as just are not a fabrication of the judges. They have not been fixed by a court to take effect thereafter. They are the rates prescribed for the future by the appointed administrative agency, and that on two occasions, after scrutiny and study of injustice suffered in the past. The court surveys the years and discerns the same injustice, dominant at the beginning as well as at the end. Indeed, nowhere in the record is there a suggestion on the part of any one that during this long litigation there has been any change of conditions whereby a discrimination against interstate commerce illegitimate at one time would be innocent at another. What was injustice at the date of the second order of the Commission is shown beyond a doubt to have been injustice also at the first. A situation so unique is a summons to a court of equity to mould its plastic remedies in adaptation to the instant need.

The case up to this point has been dealt with on the assumption that the award upon restitution is to be for the whole demand or nothing. There is, however, a possi-

bility between these two extremes, a possibility exemplified in the decree of the court below. The District Court, following the recommendation of the master, refused a decree of restitution for the full amount of the difference between the collections by the carrier and the rates of the Cummer scale, but did award restitution for 34% of that difference, or $99,941.77. We think the claim for restitution should have been rejected altogether. In thus holding we do not suggest that the determination of the Interstate Commerce Commission as to the rates to be operative thereafter had the force of *res judicata* in respect of past transactions. Cf. *Arizona Grocery Co.* v. *Atchison, T. & S. F. Ry. Co.*, 284 U. S. 370, 389; *State Corporation Commission* v. *Wichita Gas Co.*, 290 U. S. 561, 569. None the less, as the court below conceded, it was entitled to great respect, representing, as it did, the opinion of a body of experts upon matters within the range of their special knowledge and experience. *Illinois Central R. Co.* v. *Interstate Commerce Comm'n*, 206 U. S. 441, 454; *Virginian Ry. Co.* v. *United States*, 272 U. S. 658, 665. This court has already held that their findings had support in the evidence before them. *Florida* v. *United States*, 292 U. S. 1, 12.

The present record does not satisfy us that a new scale should be set up to govern claims for restitution. The field of inquiry is one in which the search for certainty is futile. Opinions will differ as to the qualifications of experts, the completeness of their inquiry into operating costs, the accuracy of their methods of computation, the soundness of their estimates. There is a zone of reasonableness within which judgment is at large. *Banton* v. *Belt Line Ry. Corp.*, 268 U. S. 413, 422, 423. Only by accident perhaps would two courts or administrative bodies draw the line within the zone at precisely the same points. In a sense, then, it is true that there is

support in fairness and reason for each of the two conclusions, the Commission's and the master's. More than this, however, must be made out to uphold the claims in suit. The claimants do not sustain the burden that is theirs by showing that the master set up a reasonable schedule. They must show that the other schedule, the one set up by the Commission, is unreasonable. In the absence of such a showing the carrier does not offend against equity and conscience in standing on its possession and keeping what it got.

The decree is reversed and the cause remanded with instructions to dismiss the claims.

*Reversed.*

MR. JUSTICE ROBERTS, dissenting.

A tariff of rates for intrastate carriage of logs, known as the " Cummer Scale," was in effect over lines of the Atlantic Coast Line Railroad in Florida. The Interstate Commerce Commission, upon complaint that these rates unduly discriminated against interstate commerce, held an investigation which eventuated in an order effective February 8, 1929 increasing the rates for the future to a parity with interstate rates. A statutory district court in the Northern District of Georgia dismissed a bill praying that it enjoin and set aside the order. This court reversed the decree, holding the order void for want of supporting findings, and the district court then entered an injunction. As a consequence of the error of the court, the Coast Line collected the higher rates from February 8, 1929 to March 7, 1931. The State on behalf of shippers and certain shippers in their own right prayed an award of restitution by the court whose error made possible the collection of the unauthorized charges. They were awarded sums representing the difference between what they paid and what the court found would have been a reasonable and nonconfiscatory rate during the period. They were denied the full difference between the established State rate and

the unlawful rate fixed by the Interstate Commerce Commission.

I concur in the view that the decision below cannot stand, but think the direction to the District Court should be to enter judgment in favor of the claimants and against the railroad for the difference between the rates, exacted between February 8, 1929 and March 7, 1931, and the lawful Florida rates. To award less will, in my judgment, sanction unconstitutional encroachment by the Federal Government upon the sovereign rights of the State of Florida.

*First.* The Cummer Scale was, prior to the Interstate Commerce Commission's order, the lawful tariff for intrastate transportation in Florida. It had been in effect over portions of the lines of the Atlantic Coast Line in that State since 1903. It had been in force on all trackage of that railroad in Florida since 1914. Originally established by contract between the railroad and certain shippers, it was, in 1914, filed by the carrier as a rate schedule for trainload lots only. The Florida Railroad Commission disapproved the tariff as filed, and insisted that it apply also to carload lots. The Coast Line acquiesced and amended the tariff accordingly. In 1927 that commission, after notice and hearing, the Coast Line being represented, published a rule making all existing rates, whether voluntarily established or otherwise, commission rates, and prohibiting alteration or discontinuance of them save upon application to and approval by the commission. Compare *Western & Atlantic Railroad* v. *Georgia Public Service Comm'n,* 267 U. S. 493.

As the statutes of Florida stood prior to 1913, rate schedules promulgated by the commission were merely prima facie evidence of reasonableness. If the carrier exacted more than the scheduled rate and was sued for overcharge, it might overcome the prima facie case made by proof of the commission rate, by showing that the

amount collected was in fact reasonable.[1]   By the act of
June 7, 1913,[2] the law was amended.   The supreme court
of Florida has construed the amendment to make a rate
prescribed after investigation and hearing, the lawful
rate,[3] and the only rate the carrier may charge so long
as the commission's order remains in force.   We are
bound by this construction of the local law.

*Second*.  Since the federal courts respect a state law
which requires persons to exhaust administrative remedies
before resorting to the courts, they cannot, any more than
can the state courts, inquire into the reasonableness of a
Florida commission-made rate in a litigation seeking the
recovery of overcharges.   This is not to say that after the

---

[1] *Pensacola & Atlantic R. Co.* v. *State*, 25 Fla. 310; 5 So. 833; *Cullen* v. *Seaboard Air Line Ry. Co.*, 63 Fla. 122; 58 So. 182; *La Floridienne* v. *Atlantic Coast Line R. Co.*, 63 Fla. 208; 58 So. 185.

[2] Ch. 6527, Laws of Florida, 1913, p. 403.

[3] *Louisville & N. R. Co.* v. *Speed-Parker, Inc.*, 103 Fla. 439, 448, 452, 453; 137 So. 724.   *Reinschmidt* v. *Louisville & N. R. Co.*, 118 Fla. 237; 160 So. 69.   In the latter case the court said [p. 240]:

" Where on the trial of a controversy over freight charges the nature and character of a particular shipment by rail is established by the evidence or has been admitted, and it appears that the Florida Railroad Commission has, after due notice and lawful hearing, prescribed and put into force a particular freight tariff and classification governing the freight charges to be imposed by the carrier for the haulage of a freight shipment of the particular nature and character shown or admitted by the evidence in the case, the Railroad Commission tariff is, as a matter of law, the only applicable and controlling tariff, and the court is without the right to enter upon any inquiry whether or not the prescribed Railroad Commission rate is just or reasonable or is otherwise proper as a proposition of administrative scientific rate making.   Under the present law of Florida a rate cannot be collaterally attacked for unreasonableness after it is prescribed in due form of procedure by the Railroad Commission, nor attacked as a matter of law on grounds not going to the legality of the procedure by which the prescribed rate or classification was arrived at by the Railroad Commission in promulgating it."

exhaustion of the administrative remedy one aggrieved by a rate prescribed by state authority may not sue to set aside the rate as confiscatory. This he may do either in a state or a federal tribunal.[4] But such a suit is to set aside and enjoin the enforcement of the rate, which has the force of a statute until so overthrown. The carrier cannot avoid the mandatory quality of the state's regulation by pleading and proving in an action to recover overcharges that the rate in force at the time of the transaction was unreasonable, and that the higher charge exacted was in fact reasonable. A federal court is without power to fix reasonable rates; its jurisdiction ends with a decision that established rates are confiscatory and an injunction against their enforcement; it may not impose a different rate, since so to do would be to usurp the functions of the rate-making body established by state law.[5] This the court below essayed by substituting what it found to be reasonable rates for the established state rates which it thought unreasonably low, and awarding the claimants the difference between the rates so fixed and those collected under color of the void order.

*Third.* The constitutional power of Congress to regulate interstate commerce, and the incidental power to prevent unjust discrimination against that commerce by intrastate rates, is not self-executing, but must be exercised by appropriate legislation. Until Congress acts the States are free to regulate intrastate commerce as they see fit, subject only to the limitations set by the Four-

[4] Relief is granted in case of confiscatory rates not under the commerce clause but under the Fourteenth Amendment. See, for example, *Minnesota Rate Cases*, 230 U. S. 352, 433ff; *Northern Pacific* v. *North Dakota*, 236 U. S. 585; *Brooks-Scanlon Co.* v. *Railroad Commission*, 251 U. S. 396; *Chicago, M. & St. P. Ry. Co.* v. *Public Utilities Commission*, 274 U. S. 344.

[5] *Central Kentucky Natural Gas Co.* v. *Railroad Commission*, 290 U. S. 264, 271, and cases cited.

teenth Amendment. By the Interstate Commerce Act the regulation of interstate rates was vested exclusively in the Interstate Commerce Commission.[6] This court held the legislation enabled the Commission to remove injurious discriminations against interstate traffic arising from the relation of intrastate to interstate rates, and in so doing the Commission might require interstate carriers not to charge higher rates for transportation between specified interstate points than between specified intrastate points.[7] In further exercise of the power to regulate interstate commerce, Congress, by § 416 of the Transportation Act of February 28, 1920, which added paragraph (4) to § 13 of the Interstate Commerce Act, has declared that whenever the Commission finds that any intrastate rate causes an undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, it shall prescribe the rate or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, in order to remove the preference, prejudice or discrimination, and that its orders in that behalf shall be obeyed by the carriers, the law of any state, or the order or decision of any state authority, to the contrary notwithstanding. The section authorizes not only the removal of discrimination as between persons and places, but also such as imposes an undue revenue burden upon interstate commerce.[8]

Congress has provided for the setting aside of unlawful orders of the Commission by suits in equity in district

---

[6] *Minnesota Rate Cases, supra,* 396, 399, 402–415.

[7] *Houston, E. & W. Texas Ry. Co.* v. *United States,* 234 U. S. 342.

[8] *Florida* v. *United States,* 282 U. S. 194, 211; *Florida* v. *United States,* 292 U. S. 1, 4, 5.

courts of the United States;[9] but it has never conferred upon any federal court jurisdiction to deal in the first instance with the matter of discrimination.[10] The federal courts lack power even to maintain by injunction a status or to enjoin a rate pending proceedings before the Commission looking to the entry of an order affecting intrastate rates.[11]

*Fourth.* The order of the Interstate Commerce Commission of August 2, 1928, being null and void, could not justify the carrier in thereafter collecting the increased rates therein named. When in May, 1926, the Georgia Railroad Commission complained to the Commission that certain of the Coast Line's rates on logs between points in Florida were unduly low as compared with interstate rates, the Commission was without power to enter an interlocutory order raising the intrastate rates. It was bound by the provisions of the Act to institute an inquiry and could enter an order only upon adequate evidence and findings which should be prospective in operation. August 2, 1928, it made such an order, which it declared effective February 8, 1929. The State of Florida, by its Railroad Commission, recognized that until that order was set aside, it must be obeyed, and consequently made its own orders No. 979 and No. 990, suspending the Cummer Scale so long as federal Commission's order should remain in force. Notwithstanding that order and an amendatory order were unsupported by appropriate findings, the district court which was asked to enjoin and set them aside held them valid.[12]

---

[9] Act of October 22, 1913, c. 32, 38 Stat. 219; U. S. C., Tit. 28, §§ 41 (27) (28), 43–48. Supp. V, Tit. 28, §§ 41 (27), 44, 45, 45a, 46, 47a, 48.

[10] *Minnesota Rate Cases, supra,* 419; *Atlantic Coast Line R. Co.* v. *Trammell,* 287 Fed. 741, 743.

[11] *Board of Railroad Commissioners* v. *Great Northern Ry. Co.,* 281 U. S. 412.

[12] 30 F. (2d) 116; 31 F. (2d) 580.

324

We reversed the decree and condemned the final order as void.[13] If the district court had acted in accordance with law it would have set aside the order. Had it done so the Coast Line, in the absence of any action by the Florida Commission fixing other rates, would have been bound to collect only those specified in the Cummer Scale. In reliance upon the erroneous decision of the district court, however, the railroad exacted the increased rates approved by the Interstate Commerce Commission. The state of Florida and shippers protested that these were not lawful and pressed with vigor to have them set aside. Our decision reversing the district court's decree was rendered January 5, 1931. The Coast Line, taking the position that further action by the Interstate Commerce Commission might in some way cure the defect in its order, moved us to stay our mandate of reversal to the district court, or in the alternative, that we include in the mandate a direction to that court to maintain the status quo until the Commission should have opportunity to reopen its proceedings and properly determine the matter. We denied the motion for the obvious reason that neither we nor the court below could authorize the railroad to persist in charging rates which had been fixed by a void order. Upon the going down of our mandate the district court entered it as its decree in the cause; and the Coast Line, as it was bound to do, immediately reduced its rates to the level of the Cummer Scale. On April 6, 1931 the Commission reopened the proceedings, heard much new evidence in respect of the then existing situation (not that theretofore existing in May, 1926, the date of the original complaint), and upon adequate evidence and adequate findings ruled that the rates of the Cummer Scale then were and for the future would be unjustly discriminatory against interstate com-

[13] 282 U. S. 194.

merce. It entered an order July 5, 1932, raising the intra-state rates.[14] Thereupon the Coast Line put into force the higher rates prescribed. A statutory district court refused to enjoin and set aside the order,[15] and we affirmed its judgment.[16]

*Fifth.* Upon the entry of the decree in obedience to our mandate, the statutory district court had jurisdiction to entertain a prayer for restitution of the excess charges paid by shippers, parties to or represented in the cause, solely by force of its original erroneous judgment.[17] If the Coast Line, due to that court's error, had collected more than the legal rate, it owed an obligation to re-store the excess to each of the complaining shippers. To refuse to consider their prayer would be to remit each of them to his separate action against the carrier for an overcharge; and to insist upon such a multiplicity of ac-tions in the circumstances would be tantamount to a denial of justice.[18] But the fact that the court had juris-diction to entertain the omnibus claim for restitution in no wise alters the legal nature of the claim of each plain-tiff or the measure of the respondent's obligation. If each of the shippers instead of asking restitution of the district court had instituted his separate action either in a Florida state court or, because of diversity of citizenship and the amount in controversy, in a federal district court, he need only have offered the Cummer Scale and the order of the Railroad Commission of Florida making it the law-ful established tariff. This would have made a prima facie case for the recovery of all excess charged over the

[14] 186 I. C. C. 157. After a further hearing the order was confirmed on January 8, 1933; 190 I. C. C. 588.

[15] 4 F. Supp. 477.

[16] 292 U. S. 1.

[17] *Baltimore & Ohio R. Co.* v. *United States*, 279 U. S. 781.

[18] *Ibid.*, 786.

rates fixed by that scale. The defendant railroad company could not have offered the void decree of the Interstate Commerce Commission as an excuse for the overcharge. Neither a state court nor a federal court in such an action could have entertained a plea that some two years after the entry of the void order, the Interstate Commerce Commission had made another based on new evidence, and prospective only in operation. These facts would not tend to prove that the lawfully established Florida intrastate rates unduly discriminated against interstate commerce at the time of the collection of the challenged charge, or were then confiscatory.

As has been shown the Cummer Scale embodied the lawful rates for intrastate carriage. Until the federal Commission had raised those rates for the future by an order made in accordance with law, the scale remained in force, and the carrier was bound to observe it. The order of the Commission effective February 8, 1929 did not supersede it. The district court has no power to disregard it or to fix rates other than those contained in it. The rights of intrastate shippers are fixed by that scale, have never been abrogated, and must be recognized in every court, state or federal. For the district court or this court to refuse the complainants the full measure of those rights would be to set at naught the laws of Florida in violation of the Federal Constitution.

*Sixth.* Moreover this is not a case in which equitable considerations have any place. It is said that the Coast Line was compelled to exact the increased rates named in the Interstate Commerce Commission's order so long as that order stood unreversed, under pain of criminal prosecution, and that it would therefore be inequitable to compel it to restore what it thus unlawfully took. This argument overlooks the countervailing rights of the shippers and the state of Florida. The shippers, despite their efforts to set the order aside, were bound under similar pains

and penalties to pay the increased rates. Had it not been for the unlawful order they would have continued to pay rates named in the Cummer Scale until the Florida commission had itself altered them, or a court of competent jurisdiction, upon a finding that they were confiscatory, had set them aside. No such procedure was initiated by the carrier. What of the rights of the state of Florida? Its duly constituted authorities had prescribed rates which had the force of a statute until repealed or set aside. These rates had been fixed, we must presume, with no thought of discrimination against interstate commerce. The federal court for northern Georgia had erroneously approved the unlawful suspension of the state schedule. Has the State no equity to insist on behalf of its citizens that its rates shall be observed until they have been lawfully superseded?

It is urged that it now appears the Interstate Commerce Commission was right in holding the Florida rates unjustly discriminated against interstate commerce, and the order consequent upon this right conclusion was voided merely because of a procedural error. The answer is that the evidence in the two Commission hearings was different, and we may not assume that if the Commission had observed its duty to make adequate findings, it could have drawn support for such findings from the record on which the first order was based; and the second and valid order made in 1932 cannot apply retroactively to affect lawful state rates in force prior to its issuance. Nor is the contention sound that this court has now held the Commission's findings were supported by evidence. This is true with respect to the second order, but this court has never so held as to the first. In fact we refused to analyse the evidence, because that was the duty of the Commission, not of this court.[19] Of course that body properly may rely on the prior experience of carriers in making its orders for

---

[19] 282 U. S. 215.

their future conduct; but this does not justify a court in relying on the evidence taken by the Commission in an independent trial of a wholly different issue.

We are told that restitution is an equitable doctrine and that as the court, upon consideration of all the facts, should hold there was no inequity in the carrier's retaining what it had collected, refusal of a decree is merely to withhold action, as a court of equity is always free to do in such circumstances. But the weakness of this argument is, that by refusing relief the court in effect denies legal rights. It is not suggested that a dismissal of the motion will not be *res judicata* in any action hereafter brought to recover for overcharges; and if so, the decision in this case is an adjudication by a federal court that the collection of the increased rate was lawful, the invalidity of the Commission's order and the law of Florida to the contrary notwithstanding.

The burden is said to rest upon the claimants of restitution to show that the Interstate Commerce Commission's schedule was unreasonable. This is but to confuse the two orders. The first order was as matter of law unreasonable because without proper support. The second order was reasonable because it had such support in the record and findings. It confuses the issue to relate the propriety of the second order to the Commission's earlier void action. The same confusion persists in the carrier's assertion that § 13 (4) denounces unjust discrimination and the injustice exists whether the Commission has so found or not. The answer is that Congress has not vested courts with jurisdiction to determine whether state rates discriminate against interstate commerce, and the statutory district court had no more authority to investigate that question at the behest of any party before it than would any other state or federal court in an action for an overcharge. Congress has directed that the fact of

discrimination shall be ascertained solely by the Commission.

Finally, it is said that the Coast Line's equity is the greater because the state rates have been found to be confiscatory. No Florida court has so found. Confiscation was not and could not be the issue before the Interstate Commerce Commission in either the original or the reopened proceeding. Two scales of rates, both in themselves within the zone of reasonableness, may upon examination disclose undue discrimination. The confiscatory character of the intrastate rate may be and often is an element to be considered upon the issue of discrimination, but obviously the order of the Commission could not be based upon that alone. If the statement means that in the restitution proceeding the statutory district court found the state rates were so low as to be confiscatory, the answer is that in a suit to recover overcharges the court had no jurisdiction to investigate a claim of confiscation under the Fourteenth Amendment.

The case is not to be decided according to the character ascribed to the first order of the Commission. Whether called void or voidable, the order gave the railroad no right to collect the sums exacted. If, as must be conceded, the carrier took, under and by force of that order, money to which it was not in law entitled, the conclusion necessarily follows that it must restore what was so taken.

To hold that the claimants may not have restitution is to say that invalid, void or voidable orders of the Commission have precisely the same force and effect as orders lawfully made, if from extrinsic facts and matters not cognizable by the court the conclusion may be drawn that the Commission might have made a valid order in the circumstances. So to hold is to recognize in a restitution proceeding, a jurisdiction which in no other circumstances and in no other case could a federal court exercise;

330

and to permit that court to ignore and nullify action in a field within the State's sovereign power.

The CHIEF JUSTICE, MR. JUSTICE BRANDEIS, and MR. JUSTICE STONE, concur in this opinion.